Hillsborough-northern judicial district
No. 2008-945

## THE STATE OF NEW HAMPSHIRE

v.

## MICHAEL ADDISON

Argued: April 28, 2010
Opinion Issued: October 6, 2010

*Michael A. Delaney,* attorney general (*N. William Delker,* senior assistant attorney general, *& a.* on the brief, and *Mr. Delker* orally), for the State.

*David M. Rothstein,* deputy chief appellate defender, of Concord, *& a.* on the brief, and *Mr. Rothstein* orally, for the defendant.

*Cassandra Stubbs* and *Brian W. Stull,* of Durham, North Carolina, staff attorneys, on the joint brief, for the American Civil Liberties Union Foundation, as *amicus curiae.*

*Barbara Keshen,* of Concord, staff attorney, on the joint brief, for the New Hampshire Civil Liberties Union, as *amicus curiae.*

*Bernstein Shur*, of Manchester (*Andru H. Volinsky* on the brief), for Chief Justice Deborah T. Poritz (Ret.) and Professor Carol S. Steiker, as *amici curiae*.

*Brennan Caron Lenehan & Iacopino*, of Manchester (*Michael J. Iacopino* on the brief), for New Hampshire Association of Criminal Defense Lawyers, as *amicus curiae*.

*Douglas, Leonard & Garvey, P.C.*, of Concord (*Charles G. Douglas, III* and *Jason R.L. Major* on the brief), for New Hampshire Associations of Chiefs of Police, The New Hampshire Sheriff's Association, The New Hampshire Police Association, and The New Hampshire Troopers Association, as *amici curiae*.

BRODERICK, C.J. This is the second opinion in which we address the process we will follow in applying the provisions of RSA 630:5 (2007) to our mandatory review of the defendant's sentence of death. *See State v. Addison*, 159 N.H. 87 (2009).

I

The defendant, Michael Addison, was convicted of capital murder for the killing of a law enforcement officer acting in the line of duty. *See* RSA 630:1, I(a) (2007). On December 18, 2008, a jury recommended that he be sentenced to death, RSA 630:5, IV, and four days later, the Superior Court (*McGuire*, J.) imposed the recommended sentence, *see* RSA 630:5, V. His conviction and sentence are before us on appeal. *See* RSA 630:5, X.

In *Addison*, we addressed the parties' responses regarding the recommended procedure and schedule to be followed in this appeal. In response to our request that the parties address five enumerated questions, they submitted joint answers to four of them but were unable to agree as to "[t]he process that the court should follow in reviewing the sentence of death, and in making the specific determinations required by RSA 630:5, XI." *Addison*, 159 N.H. at 89. While we concluded that formal rulemaking for review of death penalty cases was not required, *id.* at 93, we also concluded that "in the interest of fairness, because the parties do not have the benefit of [any] prior interpretation of RSA 630:5 [by this court], we will determine the standards to be applied to each of the three factors in RSA 630:5, XI prior to our review of the merits." *Id.* at 94.

Accordingly, on July 29, 2009, we issued the following order, which states in pertinent part:

RSA 630:5, XI provides:

XI. With regard to the sentence the supreme court shall determine:

(a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and

(b) Whether the evidence supports the jury's finding of an aggravating circumstance, as authorized by law; and

(c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Pursuant to our opinion dated July 9, 2009, the parties are ordered to file briefs addressing the following:

The process that the court should follow in reviewing the sentence of death and in making the specific determinations required by RSA 630:5, XI, and the standards the court should apply to each of the three factors enumerated in RSA 630:5, XI.

We will decide the standards this court should apply to RSA 630:5, XI(a) and (b) as necessary in the merits appeal. At this juncture we address only section XI(c), commonly known as comparative proportionality review. As we have noted previously, "states that continue to require a comparative proportionality review have developed standards." *Addison*, 159 N.H. at 94. However, in New Hampshire, RSA 630:5, XI(c) has not yet been construed because the defendant's case is the first death sentence imposed since the provision was enacted. Thus, the issue of the standards to be applied under RSA 630:5, XI(c) is a question of first impression. *See id.*

II

Paragraphs X to XII of RSA 630:5 establish the procedure we are required to follow in reviewing a capital murder appeal when a defendant has been sentenced to death. Paragraph XI specifically requires us to make three determinations with regard to the sentence. The third of these determinations is "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." RSA 630:5, XI(c). This provision must be construed in light of several decisions of the United States Supreme Court that outline constitutionally permissible legislative choices for the administration of the death penalty. We turn then to that history.

In 1972, the Supreme Court struck down capital punishment statutes in Georgia and Texas that left the decision to impose the death penalty to the uncontrolled discretion of the judge or the jury. *Furman v. Georgia*, 408 U.S. 238 (1972). The Court held that death sentences imposed and carried out under such statutes constituted cruel and unusual punishment in

violation of the Eighth and Fourteenth Amendments to the United States Constitution. *Id.* Although five justices supported the *per curiam* decision, they did so for varying reasons, with each justice writing a separate opinion.

Justice Douglas concluded that sentencing procedures which vested juries with uncontrolled discretion in deciding whether to impose capital punishment led to arbitrary application of the death penalty to "unpopular minorities," *id.* at 255 (Douglas, J., concurring), thereby violating the principle of equal protection implicit in the ban on cruel and unusual punishments, *id.* at 253-57 (Douglas, J., concurring). Justices Brennan and Marshall concluded that the death penalty constituted cruel and unusual punishment in all circumstances. *Id.* at 305 (Brennan, J. concurring); *id.* at 370 (Marshall, J. concurring). Justice Stewart concluded that the death sentences in the case before the Court were cruel and unusual because they were "wantonly" and "freakishly" imposed upon a capriciously selected few, "in the same way that being struck by lightning is cruel and unusual." *Id.* at 309-10 (Stewart, J., concurring). Justice White concluded, based upon the infrequent imposition of the death penalty and the lack of a meaningful basis for distinguishing cases in which it was imposed from those in which it was not, that the discretionary imposition of the death penalty constituted cruel and unusual punishment. *Id.* at 310-14 (White, J., concurring). Accordingly, the Court reversed in part and remanded for further proceedings. *Id.* at 240.

As a result of the *Furman* decision, many states revised their death penalty statutes to comply with its constitutional commands. In 1976, the Supreme Court upheld the post-*Furman* death penalty statutes of Georgia, *Gregg v. Georgia*, 428 U.S. 153 (1976), Florida, *Proffitt v. Florida*, 428 U.S. 242 (1976), and Texas, *Jurek v. Texas*, 428 U.S. 262 (1976), but rejected as unconstitutional the mandatory death penalty statutes of North Carolina, *Woodson v. North Carolina*, 428 U.S. 280 (1976), and Louisiana, *Roberts v. Louisiana*, 428 U.S. 325 (1976).

The Georgia statute upheld in *Gregg* narrowed the class of defendants subject to capital punishment to those who committed homicide and against whom the jury found at least one of ten statutory aggravating circumstances beyond a reasonable doubt. *Gregg*, 428 U.S. at 196-97 (plurality opinion). In addition, the Georgia statute allowed the jury to consider any other appropriate aggravating or mitigating circumstances in determining the sentence. *Id.* at 197. The statute also provided for expedited direct review by the Georgia Supreme Court of "the appropriateness of imposing the sentence of death in the particular case." *Id.* at 166. The state court was directed to determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and . . .

[w]hether . . . the evidence support[ed] the jury's or judge's finding of a statutory aggravating circumstance . . . , and . . . [w]hether the sentence of death [was] excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *Id.* at 166-67 (quotation omitted).

The majority of the Court in *Gregg* rejected the argument that the death penalty constitutes cruel and unusual punishment in all circumstances, *id.* at 187 (plurality opinion), 226 (White, J. concurring), and determined that the Georgia statute was constitutional because it gave the sentencing authority adequate guidance in the exercise of its discretion, *id.* at 195, 198 (plurality opinion). The Court construed *Furman* as holding that the death penalty "could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner." *Id.* at 188. As the Court explained, "*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Id.* at 189.

The Court made several observations regarding the specific features of the Georgia death penalty statute and concluded that, unlike the procedures before it in *Furman*, whereby unguided juries imposed the death sentence in a "freakish" way, the new Georgia sentencing procedures

> focus the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant. While the jury is permitted to consider any aggravating or mitigating circumstances, it must find and identify at least one statutory aggravating factor before it may impose a penalty of death. In this way the jury's discretion is channeled. No longer can a jury wantonly and freakishly impose the death sentence; it is always circumscribed by the legislative guidelines.

*Id.* at 206-07.

Concerning the requirement that the Georgia Supreme Court determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant," *id.* at 167 (quotation omitted), the Court stated: "Since the proportionality requirement on review is intended to prevent caprice in the decision to inflict the [death] penalty, the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice," *id.* at 203. In addition, the Court stated:

The provision for appellate review in the Georgia capital-sentencing system serves as a check against the random or arbitrary imposition of the death penalty. In particular, the proportionality review substantially eliminates the possibility that a person will be sentenced to die by the action of an aberrant jury. If a time comes when juries generally do not impose the death sentence in a certain kind of murder case, the appellate review procedures assure that no defendant convicted under such circumstances will suffer a sentence of death.

*Id.* at 206.

In *Proffitt v. Florida*, decided the same day as *Gregg*, the Court upheld the constitutionality of Florida's post-*Furman* death penalty statute. *Proffitt*, 428 U.S. at 253 (plurality opinion). Under the Florida capital sentencing procedure, if a defendant was found guilty of a capital offense, a separate evidentiary hearing was held before the jury and the trial judge to determine the defendant's sentence. *Id.* at 248. The jury and trial judge were directed to consider mitigating and aggravating circumstances in reaching a verdict on death or life imprisonment. *Id.* at 248-50. The statute provided for automatic review by the Florida Supreme Court of all cases in which a death sentence had been imposed. *Id.* Although, unlike the Georgia statute, the Florida statute did not require the state court to conduct any specific form of review, the Court reasoned that "[s]ince . . . the trial judge must justify the imposition of a death sentence with written findings, meaningful appellate review of each such sentence is made possible." *Id.* at 251. The Court observed that "the [Florida Supreme Court], like its Georgia counterpart, consider[ed] its function to be to guarantee that the aggravating and mitigating reasons present in one case will reach a similar result to that reached under similar circumstances in another case. . . . If a defendant is sentenced to die, [the Florida Supreme Court] can review that case in light of the other decisions and determine whether or not the punishment is too great." *Id.* (quotation and brackets omitted).

Although the Florida Supreme Court had "not chosen to formulate a rigid objective test as its standard of review for all cases," *id.* at 258, the Supreme Court reasoned that "it does not follow that the appellate review process is ineffective or arbitrary. In fact, it is apparent that the Florida court has undertaken responsibly to perform its function of death sentence review with a maximum of rationality and consistency" in that "it has several times compared the circumstances of a case under review with those of previous cases in which it has assessed the imposition of death sentences." *Id.* at 258-59. The Court stated that "[b]y following this

procedure the Florida court has in effect adopted the type of proportionality review mandated by the Georgia statute." *Id.* at 259.

The Court concluded:

> Florida, like Georgia, has responded to *Furman* by enacting legislation that passes constitutional muster. That legislation provides that after a person is convicted of first-degree murder, there shall be an informed, focused, guided, and objective inquiry into the question whether he should be sentenced to death. If a death sentence is imposed, the sentencing authority articulates in writing the statutory reasons that led to its decision. Those reasons, and the evidence supporting them, are conscientiously reviewed by a court which, because of its statewide jurisdiction, can assure consistency, fairness, and rationality in the evenhanded operation of the state law. As in Georgia, this system serves to assure that sentences of death will not be "wantonly" or "freakishly" imposed.

*Id.* at 259-60.

In *Jurek v. Texas*, also decided the same day as *Gregg*, the Supreme Court reviewed capital-sentencing procedures in Texas and concluded that, although Texas had "not adopted a list of statutory aggravating circumstances the existence of which can justify the imposition of the death penalty as [had] Georgia and Florida," its action in narrowing the categories of capital homicides to intentional and knowing murders committed in five specific situations "serves much the same purpose." *Jurek*, 428 U.S. at 270 (plurality opinion). Concluding that the Texas statute did not violate the Eighth and Fourteenth Amendments, the Court stated:

> By narrowing its definition of capital murder, Texas has essentially said that there must be at least one statutory aggravating circumstance in a first-degree murder case before a death sentence may even be considered. By authorizing the defense to bring before the jury at the separate sentencing hearing whatever mitigating circumstances relating to the individual defendant can be adduced, Texas has ensured that the sentencing jury will have adequate guidance to enable it to perform its sentencing function. By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law.

*Id.* at 276.

Thus, the statutes upheld in *Gregg, Proffitt,* and *Jurek* contained three provisions intended to address the concerns raised in *Furman.* First, each provided for a bifurcated trial so that guilt and punishment would be separately determined. Second, imposition of the death penalty was restricted to cases in which certain aggravating circumstances were established and the sentencing authority was required to consider the existence of mitigating circumstances. This type of provision "guides and focuses the [sentencing authority's] objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death." *Id.* at 274. Third, the statutes provided for automatic expedited appellate review of death sentences as a check against their random or arbitrary imposition.

In *Woodson v. North Carolina,* the Supreme Court held that North Carolina's mandatory death sentence statute was unconstitutional because it lacked "the fundamental respect for humanity underlying the Eighth Amendment . . . [which] requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson,* 428 U.S. at 304 (plurality opinion). The Court identified several constitutional shortcomings with the mandatory death penalty statute. First, it held that such a statute is inconsistent with "one of the most significant developments in our society's treatment of capital punishment," which has been "the rejection of the common-law practice of inexorably imposing a death sentence upon every person convicted of a specified offense." *Id.* at 301. Second, it held that such a statute fails "to provide a constitutionally tolerable response to *Furman's* rejection of unbridled jury discretion in the imposition of capital sentences" in that "[c]entral to the limited holding in *Furman* was the conviction that the vesting of standardless sentencing power in the jury violated the Eighth and Fourteenth Amendments." *Id.* at 302. Finally, it concluded that such a statute fails "to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before imposition upon him of a sentence of death." *Id.* at 303. As the Court explained,

> [a] process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.

*Id.* at 304; *see also Roberts*, 428 U.S. at 335-36 (plurality opinion).

The New Hampshire legislature also responded to the Supreme Court's developing death penalty jurisprudence. At the time the Court decided *Furman*, New Hampshire law provided that "[t]he punishment of murder in the first degree shall be death or imprisonment for life, as the jury may determine." RSA 585:4 (1955) (repealed); Laws 1915, 65:3. In *State v. Martineau*, we acknowledged that we were bound by the Supreme Court's decision in *Furman*, and thus the death penalties on appeal violated the Eighth and Fourteenth Amendments to the Federal Constitution. *State v. Martineau*, 112 N.H. 278, 279 (1972). Accordingly, we held that the trial court had the obligation to vacate the death sentences. *Id.* at 280.

The New Hampshire legislature reacted to *Furman* and *Martineau* by enacting a mandatory death penalty statute. *See* RSA 630:1, III (1974) (repealed); Laws 1974, 34:1. As did other states, prior to the Supreme Court's decisions in *Woodson* and *Roberts*, New Hampshire initially misread the holding in *Furman* to require that a constitutional death penalty statute had to automatically require imposition of the death penalty upon conviction of capital murder. In fact, in *Woodson*, the Supreme Court recognized that "[t]he fact that some States have adopted mandatory measures following *Furman* while others have legislated standards to guide jury discretion appears attributable to diverse readings of this Court's multi-opinioned decision in that case." *Woodson*, 428 U.S. at 298-99.

Following the Supreme Court's 1976 decisions, the New Hampshire legislature enacted a new statutory scheme establishing the procedure to be followed in capital murder cases. *See* RSA 630:5 (Supp. 1979); Laws 1977, 440:2. Generally stated, that statute established a bifurcated process whereby the jury would first consider a defendant's guilt and in a separate proceeding determine the penalty. During the sentencing hearing the jury was directed to consider certain statutory aggravating and mitigating circumstances. If the jury found at least one aggravating circumstance by unanimous vote, it could impose the penalty of death. The legislation also established an automatic review procedure before this court. Although the sentencing scheme for capital murder enacted by the legislature in 1977 has been modified somewhat, it is the basis of the current capital sentencing statute.

### III

The current version of RSA 630:5 sets forth the procedure to be followed in a capital murder case. Section I requires the State to provide formal notice of its intent to seek the death penalty:

> I. Whenever the state intends to seek the sentence of death for the offense of capital murder, the attorney for the state, before trial or

acceptance by the court of a plea of guilty, shall file with the court and serve upon the defendant, a notice:

(a) That the state in the event of conviction will seek the sentence of death; and

(b) Setting forth the aggravating factors enumerated in paragraph VII of this section and any other aggravating factors which the state will seek to prove as the basis for the death penalty.

The court may permit the attorney for the state to amend this notice for good cause shown. Any such amended notice shall be served upon the defendant as provided in this section.

Section II sets forth the requirement that a separate sentencing hearing be held:

II. When the attorney for the state has filed a notice as required under paragraph I and the defendant is found guilty of or pleads guilty to the offense of capital murder, the judge who presided at the trial or before whom the guilty plea was entered, or any other judge if the judge who presided at the trial or before whom the guilty plea was entered is unavailable, shall conduct a separate sentencing hearing to determine the punishment to be imposed. The hearing shall be conducted:

(a) Before the jury which determined the defendant's guilt;

(b) Before a jury impaneled for the purpose of the hearing if:

(1) the defendant was convicted upon a plea of guilty; or

(2) the jury which determined the defendant's guilt has been discharged for good cause; or

(3) after initial imposition of a sentence under this section, redetermination of the sentence under this section is necessary.

A jury impaneled under subparagraph (b) shall consist of 12 members, unless at any time before the conclusion of the hearing,

the parties stipulate with the approval of the court that it shall consist of any number less than 12.

Sections III and IV set forth the procedure for considering aggravating and mitigating factors at the sentencing hearing:

III. When a defendant is found guilty of or pleads guilty to the offense of capital murder, no presentence report shall be prepared. In the sentencing hearing, information may be presented as to matters relating to any of the aggravating or mitigating factors set forth in paragraphs VI and VII, or any other mitigating factor or any other aggravating factor for which notice has been provided under subparagraph I(b). Where information is presented relating to any of the aggravating factors set forth in paragraph VII, information may be presented relating to any other aggravating factor for which notice has been provided under subparagraph I(b). Information presented may include the trial transcript and exhibits if the hearing is held before a jury or judge not present during the trial, or at the trial judge's discretion. Any other information relevant to such mitigating or aggravating factors may be presented by either the state or the defendant, regardless of its admissibility under the rules governing admission of evidence at criminal trials, except that information may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. The state and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any of the aggravating or mitigating factors and as to appropriateness in that case of imposing a sentence of death. The state shall open and the defendant shall conclude the argument to the jury. The burden of establishing the existence of any aggravating factor is on the state, and is not satisfied unless established beyond a reasonable doubt. The burden of establishing the existence of any mitigating factor is on the defendant, and is not satisfied unless established by a preponderance of the evidence.

IV. The jury shall consider all the information received during the hearing. It shall return special findings identifying any aggravating factors set forth in paragraph VII, which are found to exist. If one of the aggravating factors set forth in subparagraph VII(a) and another of the aggravating factors set forth in subparagraphs

VII(b)-(j) is found to exist, a special finding identifying any other aggravating factor for which notice has been provided under subparagraph I(b) may be returned. A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established for purposes of this section, regardless of the number of jurors who concur that the factor has been established. A finding with respect to any aggravating factor must be unanimous. If an aggravating factor set forth in subparagraph VII(a) is not found to exist or an aggravating factor set forth in subparagraph VII(a) is found to exist but no other aggravating factor set forth in paragraph VII is found to exist, the court shall impose a sentence of life imprisonment without possibility of parole. If an aggravating factor set forth in subparagraph VII(a) and one or more of the aggravating factors set forth in subparagraph VII(b)-(j) are found to exist, the jury shall then consider whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death. Based upon this consideration, if the jury concludes that the aggravating factors outweigh the mitigating factors or that the aggravating factors, in the absence of any mitigating factors, are themselves sufficient to justify a death sentence, the jury, by unanimous vote only, may recommend that a sentence of death be imposed rather than a sentence of life imprisonment without possibility of parole. The jury, regardless of its findings with respect to aggravating and mitigating factors, is never required to impose a death sentence and the jury shall be so instructed.

Section V requires that the trial court sentence the defendant to death if the jury makes such recommendation:

V. Upon the recommendation that the sentence of death be imposed, the court shall sentence the defendant to death. Otherwise the court shall impose a sentence of life imprisonment without possibility of parole.

Section VI sets forth mitigating factors:

VI. In determining whether a sentence of death is to be imposed upon a defendant, the jury shall consider mitigating factors, including the following:

(a) The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge.

(b) The defendant was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge.

(c) The defendant is punishable as an accomplice (as defined in RSA 626:8) in the offense, which was committed by another, but the defendant's participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge.

(d) The defendant was youthful, although not under the age of 18.

(e) The defendant did not have a significant prior criminal record.

(f) The defendant committed the offense under severe mental or emotional disturbance.

(g) Another defendant or defendants, equally culpable in the crime, will not be punished by death.

(h) The victim consented to the criminal conduct that resulted in the victim's death.

(i) Other factors in the defendant's background or character mitigate against imposition of the death sentence.

Section VII sets forth aggravating factors:

VII. If the defendant is found guilty of or pleads guilty to the offense of capital murder, the following aggravating factors are the only aggravating factors that shall be considered, unless notice of additional aggravating factors is provided under subparagraph I(b):

(a) The defendant:

(1) purposely killed the victim;

(2) purposely inflicted serious bodily injury which resulted in the death of the victim;

(3) purposely engaged in conduct which:

(A) the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense; and

(B) resulted in the death of the victim.

(b) The defendant has been convicted of another state or federal offense resulting in the death of a person, for which a sentence of life imprisonment or a sentence of death was authorized by law.

(c) The defendant has previously been convicted of 2 or more state or federal offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the infliction of, or attempted infliction of, serious bodily injury upon another person.

(d) The defendant has previously been convicted of 2 or more state or federal offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the distribution of a controlled substance.

(e) In the commission of the offense of capital murder, the defendant knowingly created a grave risk of death to one or more persons in addition to the victims of the offense.

(f) The defendant committed the offense after substantial planning and premeditation.

(g) The victim was particularly vulnerable due to old age, youth, or infirmity.

(h) The defendant committed the offense in an especially heinous, cruel or depraved manner in that it involved torture or serious physical abuse to the victim.

(i) The murder was committed for pecuniary gain.

(j) The murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from lawful custody.

Sections VIII and IX concern life imprisonment sentences:

VIII. If a person is convicted of the offense of capital murder and the court does not impose the penalty of death, the court shall impose a sentence of life imprisonment without possibility of parole.

IX. If the jury cannot agree on the punishment within a reasonable time, the judge shall impose the sentence of life imprisonment without possibility of parole. If the case is reversed on appeal because of error only in the presentence hearing, the new trial which may be ordered shall apply only to the issue of punishment.

Sections X through XII set forth the requirements for review of the death sentence by this court:

X. In all cases of capital murder where the death penalty is imposed, the judgment of conviction and the sentence of death shall be subject to automatic review by the supreme court within 60 days after certification by the sentencing court of the entire record unless time is extended for an additional period not to exceed 30 days by the supreme court for good cause shown. Such review by the supreme court shall have priority over all other cases and shall be heard in accordance with rules adopted by said court.

XI. With regard to the sentence the supreme court shall determine:

(a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and

(b) Whether the evidence supports the jury's finding of an aggravating circumstance, as authorized by law; and

(c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

XII. In addition to its authority regarding correction of errors, the court, with regard to review of death sentences, shall be authorized to:

(a) Affirm the sentence of death; or

(b) Set the sentence aside and remand the case for resentencing.

IV

Our task today is to construe RSA 630:5, XI(c), which provides: "With regard to the sentence the supreme court shall determine . . . [w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." This is a matter of statutory interpretation that we determine *de novo. See State v. Kousounadis,* 159 N.H. 413, 423 (2009). The constitutionality of the statute is not before us, and thus we presume it is constitutional. *Duquette v. Warden, N.H. State Prison,* 154 N.H. 737, 745 (2007). The sole issue before us is one of statutory construction.

We are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. *Addison,* 159 N.H. at 91. We look to the plain language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning, *id.,* and we construe provisions of the Criminal Code "according to the fair import of their terms and to promote justice," RSA 625:3 (2007). We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language it did not see fit to include. *Kousounadis,* 159 N.H. at 423. Additionally, we interpret a statute in the context of the overall statutory scheme and not in isolation. *Id.*

▮ The current appellate review language of RSA 630:5, XI(c) is identical to the language in the 1977 statute. That language, in turn, mirrors the corresponding language of the Georgia statute, which the Supreme Court declared constitutional in *Gregg.* The legislature intended for the 1977 amendments to the death penalty procedures in this state to comply with the standards thought to be constitutionally mandated by the existing capital punishment jurisprudence as set forth by the Supreme Court, including comparative proportionality review. *See* N.H.H.R. JOUR. 527 (1977) (committee approved the bill "as a Constitutional updating of present statute relating to capital murder, making it possible to punish such offenders by reestablishing the death penalty"); N.H.S. JOUR. 2701 (1977) ("It is quite clear that the law on the books . . . is unconstitutional. . . . Probably the bill as it was amended in the House would make the law constitutional under the most recent supreme court decisions . . . ."); N.H.S. JOUR. 2702 (1977) (Senate "trying to comply with the courts" by amending the death penalty procedures); SENATE COMM. ON JUDICIARY, HR'G ON

HB 1137 (May 25, 1977) (Legal Assistant to the Speaker testifying that bill intended to comply with "the new supreme court guidelines").

■ We conclude that, in enacting the current death penalty statutory scheme, the legislature intended to incorporate the then-existing jurisprudential background of the United States Supreme Court, and we will interpret the statutory scheme accordingly. *See State v. Webb*, 680 A.2d 147, 201 (Conn. 1996) (court construing comparative proportionality review provision in light of its jurisprudential background). Moreover, given the identity of language between the comparative proportionality provision in RSA 630:5, XI(c) and the same sentence review provision approved in *Gregg*, as well as the jurisprudential context within which the statute was enacted, the Supreme Court's interpretation of that Georgia provision is particularly informative.

Further, following *Furman* and *Gregg*, many states enacted identical or similar comparative proportionality review provisions, or appellate review procedures, within the same jurisprudential context as that of New Hampshire. Thus, while United States Supreme Court jurisprudence is our paramount guidepost in interpreting the meaning of RSA 630:5, XI(c), other states' case law, while not controlling, may prove helpful to our analysis. *See, e.g., id.* at 199-204; *State v. Garcia*, 664 P.2d 969, 977-79 (N.M.), *cert. denied*, 462 U.S. 1112 (1983); *Tichnell v. State*, 415 A.2d 830, 843-47 (Md. 1980), *cert. denied*, 466 U.S. 993 (1984); *State v. Coleman*, 605 P.2d 1000, 1020 (Mont. 1979), *cert. denied*, 446 U.S. 970 (1980). Further, while some states that previously conducted comparative proportionality review have since abandoned such review, the judicial interpretation of the former statutes and procedures is nevertheless instructive. *See State v. Godsey*, 60 S.W.3d 759, 782 n.15 (Tenn. 2001) (reciting states that initially conducted comparative proportionality review but later either repealed the governing statutory provision or overruled court decisions that mandated it). In addition, we are mindful that some judicial interpretations of different aspects of comparative proportionality review have changed over time. *See, e.g., State v. Davis*, 318 S.W.3d 618, 643-45 (Mo. 2010) (detailing changes in scope of case universe); *Terrell v. State*, 572 S.E.2d 595, 605 (Ga. 2002) (*Fletcher*, C.J., concurring) (comparative proportionality review under Georgia law has changed over time), *cert. denied*, 540 U.S. 835 (2003); *State v. Brett*, 892 P.2d 29, 66-69 (Wash. 1995) (changing the interpretation of "similar cases"), *cert. denied*, 516 U.S. 1121 (1996). Ultimately, our task is to construe the meaning of RSA 630:5, XI(c) in accord with the legislature's intent in enacting it.

## V

■ Before turning to the meaning of RSA 630:5, XI(c), we underscore that there is a substantive difference between traditional and comparative proportionality review. Traditional Eighth Amendment proportionality analysis is the "abstract evaluation of the appropriateness of a sentence for a particular crime." *Pulley v. Harris*, 465 U.S. 37, 42-43 (1984); *see State v. Dayutis*, 127 N.H. 101, 105 (1985); *cf. State v. Farrow*, 118 N.H. 296, 302-03 (1978). The Supreme Court has occasionally struck down punishments as inherently disproportionate, and therefore cruel and unusual, when imposed for a particular crime. *See Pulley*, 465 U.S. at 43; *Solem v. Helm*, 463 U.S. 277 (1983) (life imprisonment without possibility of parole for habitual offender convicted of minor, nonviolent offenses disproportionate under the Eighth Amendment); *Enmund v. Florida*, 458 U.S. 782 (1982) (death sentence for felony murder when defendant did not take life, attempt to take life or intend to take life disproportionate under the Eighth Amendment); *Coker v. Georgia*, 433 U.S. 584 (1977) (death sentence for rape disproportionate under the Eighth Amendment). The death penalty "is not invariably cruel and unusual punishment within the meaning of the Eighth Amendment; . . . neither is it always disproportionate to the crime for which it is imposed." *Coker*, 433 U.S. at 591.

■ ■ By contrast, comparative proportionality review "presumes that the death sentence is not disproportionate to the crime in the traditional sense. It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime." *Pulley*, 465 U.S. at 43. Until *Pulley* was decided in 1984, it was generally thought that any capital punishment statute that did not provide for comparative proportionality review was constitutionally deficient. However, in *Pulley*, the Supreme Court reviewed California's death penalty procedure, which did not include proportionality review, and noted that its endorsement of the Georgia statutory procedures in *Gregg* did not mean that "anything different is unacceptable." *Id.* at 45. Regarding its holding in *Gregg*, the Court stated,

> While emphasizing the importance of mandatory appellate review under the Georgia statute, we did not hold that without comparative proportionality review the statute would be unconstitutional. To the contrary, we relied on the jury's finding of aggravating circumstances, not the State Supreme Court's finding of proportionality, as rationalizing the sentence. Thus, the emphasis was on the constitutionally necessary narrowing function of statutory aggravating circumstances. Proportionality review was consid-

ered to be an additional safeguard against arbitrarily imposed death sentences, but we certainly did not hold that comparative review was constitutionally required.

*Id.* at 50 (citation and footnote omitted). The Court concluded that "[t]here is . . . no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed." *Id.* at 50; *see also State v. Bland*, 958 S.W.2d 651, 663-64 (Tenn. 1997) ("comparative proportionality review is not constitutionally required [and] . . . state appellate court must evaluate the statutory language at issue and the legislative intent in light of the jurisprudential background of *Furman* and *Gregg*" in adopting an approach for state appellate review), *cert. denied*, 523 U.S. 1083 (1998).

Although several states subsequently amended their death penalty statutes to repeal comparative proportionality review, our statutory provision has remained unchanged since its enactment in 1977. *See Addison*, 159 N.H. at 94. The manner in which state high courts conduct comparative proportionality review largely is a matter left to individual states. *See McCleskey v. Kemp*, 481 U.S. 279, 306-07 (1987); *Getsy v. Mitchell*, 495 F.3d 295, 306 (6th Cir. 2007), *cert. denied*, 552 U.S. 1244 (2008); *Moore v. Balkcom*, 716 F.2d 1511, 1517-19, 1518 n.5 (11th Cir. 1983), *cert. denied*, 465 U.S. 1084 (1984); *State v. Copeland*, 300 S.E.2d 63, 72 (S.C. 1982), *cert. denied*, 463 U.S. 1214 (1983); *Garcia*, 664 P.2d at 979.

## VI

The defendant argues that the purpose of comparative proportionality review is to ensure a reasonable measure of consistency across all death-eligible cases in New Hampshire. Quoting *State v. Martini*, 651 A.2d 949, 958 (N.J. 1994), the defendant argues that a "substantial distinction [must] exist[] between capitally-sentenced and life-sentenced defendants, to limit capital sentencing to those cases that are most aggravated and in which death sentencing is the expected result, and to promote a rational, consistent, and fair application of the death sentence." He contends that, because New Hampshire has rarely imposed capital punishment, retribution, rather than deterrence, is the purpose underlying this state's death penalty scheme. According to the defendant, the standard for conducting comparative proportionality review must reflect this purpose, such that a death sentence is excessive or disproportionate, and thus must be vacated, if a great many other similarly culpable and more culpable defendants did not receive a death sentence, whether as a result of a jury's sentencing decision or prosecutorial decision-making.

The defendant proposes a two-tiered process for conducting comparative proportionality review: first reviewing New Hampshire death-eligible cases, and second comparing out-of-state death-eligible cases. The defendant argues that when the court compares New Hampshire cases (tier 1), the pool should include all death-eligible cases, even factually dissimilar ones, because "this Court at the present time has, and for the foreseeable future will have, an insufficiently large number of cases to permit subdivision into distinct groups of similar cases." He argues that when the court compares out-of-state cases (tier 2), the pool should include all cases from American jurisdictions in which the defendant was convicted of a factually similar murder (*i.e.*, killing a law enforcement officer acting in the line of duty), and the death penalty could have been sought under that state's law.

Under both tiers, the defendant advocates that we apply qualitative and quantitative measures to compare his case with the pool of comparison cases to assess proportionality. Ultimately, the defendant contends that if his death sentence is not "clearly proportionate" by an "overwhelming margin," or his murder case is not at "the highest end of the culpability scale," then we should consider whether arbitrary factors explain the sentence.

The State argues that the purpose of proportionality review is to protect the defendant against a death sentence imposed by the action of an aberrant jury, not to ensure a reasonable measure of consistency in sentencing. According to the State, comparative proportionality review considers whether the defendant's death sentence is "substantially out of line" with jury verdicts in similar cases, such that a death sentence may be disproportionate if juries have consistently imposed life sentences in similar cases, considering both aggravating and mitigating factors. The State suggests that the defendant's death sentence is not necessarily aberrant or disproportionate in light of a life sentence imposed in a similar capital murder case because that life sentence may have been an act of mercy.

The State advocates for a comparison pool that is restricted to cases in which the defendant was convicted of capital murder under post-*Furman* statutes, the prosecution sought the death penalty, and a sentencing hearing was held, regardless of whether a death or life imprisonment sentence was imposed. The State discredits the defendant's two-tiered approach, and argues that because there are no similar post-*Furman* cases in New Hampshire in which the defendant was convicted of the same statutory variant of capital murder, we should "look to the decisions of the highest courts of other jurisdictions which have undertaken proportionality review in capital cases."

Additionally, the State argues that qualitative, precedent-seeking analysis is the only appropriate method for conducting comparative proportionality review because it accounts for the various aggravating and mitigating factors that may or may not affect the outcome. According to the State, our task is not to assess whether the death penalty was appropriate for the defendant (*i.e.*, the "deathworthiness" of the capital murder case). Rather, the State argues, quoting *State v. Bacon*, 446 S.E.2d 542, 563 (N.C. 1994), that our role is to determine whether the defendant's death sentence is aberrant by "compar[ing] the case at bar with other cases in the pool which are roughly similar with regard to the crime and the defendant, such as . . . the manner in which the crime was committed and the defendant's character, background, and physical and mental condition." The State contends that "the goal of proportionality review is not to determine mathematical symmetry between capital sentences." Ultimately, the State contends that vacating "a death sentence as excessive or disproportionate is an exceptional remedy" and should occur only in the most clear and extraordinary situations.

## VII

The manner in which we conduct comparative proportionality review is guided by three aspects of RSA 630:5, XI(c): (1) the meaning of "excessive or disproportionate"; (2) the meaning and scope of "similar cases"; and (3) the mechanics for discerning whether a death penalty is "excessive or disproportionate" to the "penalty imposed in similar cases, considering both the crime and the defendant."

We first construe the meaning of an "excessive or disproportionate" death sentence. The terms "excessive" and "disproportionate" are not defined by the statute. Commonly understood, the meaning of "excessive" includes "characterized by or present in excess . . . exceeding the usual, proper, or normal . . . very large, great, or numerous : greater than usual." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 792 (unabridged ed. 2002). Similarly, "disproportionate" includes "out of proportion : UNSYMMETRICAL." *Id.* at 655. Thus, in this context, the phrase "excessive or disproportionate" generally refers to a death sentence that exceeds the usual or that is out of proportion to "the penalty imposed in similar cases, considering both the crime and the defendant."

"Excessive or disproportionate" was addressed in *Gregg* where the Supreme Court reviewed Georgia's death penalty sentencing procedures as a whole and concluded that the discretion of the sentencing authority was suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action. *See Gregg*, 428 U.S. at 189, 198 (plurality opinion). The Court held that Georgia's death penalty sentencing scheme satisfied

the Eighth Amendment concerns of *Furman* because "[n]o longer should there be no meaningful basis for distinguishing the few cases in which the death penalty is imposed from the many cases in which it is not." *Id.* at 198 (quotation and brackets omitted). In so doing, the Supreme Court first reviewed the procedures set forth for guiding the jury's sentencing decision, including the aggravating and mitigating factors identified in the statute, *id.* at 197, and concluded that the jury's discretion in imposing the death penalty was "controlled by clear and objective standards so as to produce nondiscriminatory application," *id.* at 198 (quotation omitted).

The Supreme Court considered Georgia's automatic appellate review provision "[a]s an important additional safeguard against arbitrariness and caprice," and characterized Georgia's comparative proportionality review function in particular as comparing "each death sentence with the sentences imposed on similarly situated defendants to ensure that the sentence of death in a particular case is not disproportionate." *Id.* The Court reviewed the manner in which the Georgia Supreme Court had been conducting comparative proportionality review, such that "if the death penalty is only rarely imposed for an act or it is substantially out of line with sentences imposed for other acts it will be set aside as excessive." *Id.* at 205 (quotation omitted). The Supreme Court concluded that

> the proportionality review substantially eliminates the possibility that a person will be sentenced to die by the action of an aberrant jury. If a time comes when juries generally do not impose the death sentence in a certain kind of murder case, the appellate review procedures assure that no defendant convicted under such circumstances will suffer a sentence of death.

*Id.* at 206; *see also id.* at 224 (White, J., concurring) ("if the Georgia Supreme Court properly performs the task assigned to it under the Georgia statutes, death sentences imposed . . . wantonly or freakishly for any given category of crime will be set aside"). Therefore, in performing comparative proportionality review, the state appellate court monitors death sentences imposed by juries to ensure that the particular death sentence on appeal is not the action of an aberrant jury in relation to penalties imposed by other juries who faced similar defendants convicted of similar crimes. *See id.* at 198 (plurality opinion).

We agree with the Connecticut Supreme Court that:

> [T]he United States Supreme Court's view of the appellate process of proportionality review did not involve an inquiry into whether it, or any other appellate court, might have imposed the penalty if given that responsibility in any given case. Nor was the

focus on whether the particular defendant in the case before an appellate court was more or less morally blameworthy and deserving of the death penalty than any other particular defendant.

Put another way, in the Supreme Court's view the appellate task under proportionality review was not to determine whether the capital case before it in some way was, on a scale of moral blameworthiness, roughly equivalent to all other capital cases and, absent such rough equivalence, to reverse the sentence. Nor was that review considered to require that the capital case before the court must affirmatively be shown, on such a scale, to have been quantitatively different from all other cases in which the death penalty was not imposed and, absent such an affirmative showing, to reverse the sentence.

In the Supreme Court's view, rather, the appellate inquiry under proportionality review was whether the death penalty imposed in a particular case was aberrational, within the particular jurisdiction involved, with respect to similar cases.

*Webb*, 680 A.2d at 204 (relying upon *Gregg*).

■ Our appellate review task under RSA 630:5, XI(c) differs from our review of the death verdict for "passion, prejudice or any other arbitrary factor," RSA 630:5, XI(a), and from our review for the existence of evidence supporting the aggravating circumstances upon which the death verdict rests, RSA 630:5, XI(b). While RSA 630:5, XI(a) and (b) focus upon the specific jury, evidence and sentencing verdict in the defendant's case, RSA 630:5, XI(c) requires a broader view of the defendant's case in relation to other juries facing similar defendants convicted of similar crimes.

■ We hold that under RSA 630:5, XI(c) a death penalty is "excessive or disproportionate" if it is aberrant from, or substantially out of line with, a pattern of jury verdicts which demonstrate that juries generally do not impose death in similar cases. *See Gregg*, 428 U.S. at 205-06 (plurality opinion), 224 (White, J., concurring). This appellate monitoring function serves to ensure that defendants will not incur a death sentence that is arbitrary and capricious, or wanton and freakish, in relation to penalties imposed by juries in similar cases, considering both the crime and the defendant. *See Furman*, 408 U.S. at 309-10 (Stewart, J., concurring); *Gregg*, 428 U.S. at 188, 195, 198 (plurality opinion), 224 (White, J., concurring). *Accord, e.g., State v. Bordelon*, 33 So. 3d 842, 868 (La. 2009); *Bland*, 958 S.W.2d at 665; *Webb*, 680 A.2d at 203-04, 208; *Brett*, 892 P.2d at 69; *Tichnell*

*v. State*, 468 A.2d 1, 17-18 (Md. 1983), *cert. denied*, 466 U.S. 993 (1984); *State v. Williams*, 301 S.E.2d 335, 356 (N.C.), *cert. denied*, 464 U.S. 865 (1983); *Stamper v. Com.*, 257 S.E.2d 808, 824 (Va. 1979), *cert. denied*, 445 U.S. 972 (1980); *Coleman*, 605 P.2d at 1020; *Coley v. State*, 204 S.E.2d 612, 616-17 (Ga. 1974).

## VIII

We next turn to the meaning of "the penalty imposed in similar cases," which dictates the inventory of cases we will rely upon to conduct comparative proportionality review. This inquiry involves two aspects: the procedural and substantive boundaries of "similar cases."

Regarding the intended procedural boundary, commonly known as the case universe, three primary options have emerged among the states. First, generally stated, some courts have held that the "similar cases" universe includes those cases in which a defendant may have been statutorily eligible for a death sentence, but either the prosecutor did not charge capital murder or seek capital punishment, or the defendant pled guilty to a lesser offense ("death-eligible" universe). *See, e.g.*, *State v. Papasavvas*, 790 A.2d 798, 804 (N.J. 2002). Second, other courts have limited the universe to cases in which a defendant was convicted of capital murder, the prosecutor sought capital punishment, a sentencing hearing occurred, and either a death sentence, life imprisonment without possibility of parole, or a lesser sentence was imposed ("death-and-life-imprisonment" universe). *See, e.g.*, *Tichnell*, 468 A.2d at 17-18. Third, some courts have restricted the universe to cases in which a defendant was convicted of capital murder, the prosecutor sought capital punishment, a sentencing hearing occurred, and a death sentence was imposed ("death-only" universe). *See, e.g.*, *Copeland*, 300 S.E.2d at 74. Our task is to discern the case universe intended by the legislature in enacting RSA 630:5, XI(c).

The defendant advocates for a death-eligible universe. He contends that in addition to jury verdicts, disproportionality in the imposition of death sentences can originate in prosecutorial decisions not to seek the death penalty. Quoting *State v. Loftin*, 724 A.2d 129, 147 (N.J. 1999), the defendant argues that prosecutorial decisions may often be "understood as a calculation of 'deathworthiness,' and this calculation . . . should be considered in determining whether a particular death sentence was disproportionate." According to the defendant, reviewing all death-eligible cases would assure a reasonable measure of consistent imposition of the death penalty across all similar death-eligible cases. The State, however, urges us to adopt the death-and-life-imprisonment universe, arguing, "[b]ased on the plain and unambiguous language of RSA 630:5, XI(c), the history and purpose of proportionality review, and public policy, this Court should

adopt the approach taken by the majority of jurisdictions and consider only cases in which the defendant was convicted of capital murder, the prosecution sought the death penalty, and a sentencing hearing was held."

The statute does not define "similar cases," and the term is not used elsewhere within RSA 630:5 or otherwise within the capital murder statutory scheme. The meaning of "similar" includes "having characteristics in common : very much alike : COMPARABLE" and "alike in substance or essentials." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, *supra* at 2120. Thus, the statutory term "similar cases" anticipates that the defendant's death sentence be compared only to cases that share characteristics, substance or essentials that are common to or very much like those in the defendant's capital murder case. *See* RSA 630:5.

The term "similar cases" is located within the phrase "the *penalty imposed* in similar cases, considering both the crime and the defendant." RSA 630:5, XI(c) (emphasis added). References to the "punishment" or the "sentence" to be "imposed" by the jury or judge, whether death or life imprisonment without possibility of parole, appear throughout RSA 630:5. For example, RSA 630:5, II provides that the trial court "shall conduct a separate sentencing hearing to determine *the punishment to be imposed*" if the state seeks the death penalty for a particular defendant who has been convicted of capital murder. (Emphasis added.) RSA 630:5, V provides that: "Upon the recommendation that *the sentence of death be imposed,* the court shall sentence the defendant to death. Otherwise, the court shall *impose a sentence of life imprisonment without possibility of parole.*" (Emphases added.) Under RSA 630:5, the jury's determination of the "penalty" to "impose" for the offense of capital murder occurs only after a sentencing hearing during which evidence is presented on aggravating and mitigating factors, RSA 630:5, IV. Viewing the phrase "the penalty imposed in similar cases" in RSA 630:5, XI(c) in the context of RSA 630:5 as a whole, the term "similar cases" refers to those in which a penalty of either death or life imprisonment without possibility of parole was imposed after a sentencing hearing was conducted.

Additionally, in New Hampshire, a sentence of death can be imposed only if a jury unanimously finds the existence of predicate aggravating factors. RSA 630:5, IV. When predicate aggravating factors are not unanimously found by the jury, it never reaches the decision of whether to impose a death sentence. RSA 630:5, III, IV. Such cases would thus provide no guidance on whether a defendant's death sentence is "excessive or disproportionate" as related to sentencing decisions of juries in similar cases that faced the life imprisonment or death sentencing decision.

Therefore, cases in which the jury determined that predicate aggravating factors were not established by the evidence are not "similar cases." *See Webb*, 680 A.2d at 211 (because "proportionality review requires a comparison of the decision to impose a death sentence . . . comparison cannot be appropriately made where there was no such decision by a fact finder"); *Tichnell*, 468 A.2d at 17 (the focus of comparative proportionality review "is upon capital cases in which the sentencing authority determined whether to impose a life or death sentence"); *Flamer v. State*, 490 A.2d 104, 122, 140 (Del.) (excluding cases from comparison in which jury imposed a life sentence because no statutory aggravating circumstance was found), *cert. denied*, 464 U.S. 865 (1983).

■ We hold that, in keeping with the plain language of the statute and the fair import of its terms, the universe of "similar cases" is limited to those with the following procedural characteristics: the defendant committed the offense of capital murder; a separate sentencing hearing occurred; the jury found predicate aggravating factors; and the penalty imposed was either death or life imprisonment without possibility of parole. We therefore align with jurisdictions that rely upon a death-and-life-imprisonment universe. *Accord, e.g., Bland*, 958 S.W.2d at 666; *Webb*, 680 A.2d at 210; *State v. Rhines*, 548 N.W.2d 415, 455-56 (S.D.), *cert. denied*, 519 U.S. 1013 (1996); *Satcher v. Com.*, 421 S.E.2d 821, 845 (Va. 1992), *cert. denied*, 507 U.S. 933 (1993); *State v. Battle*, 661 S.W.2d 487, 494-95 (Mo. 1983), *cert. denied*, 466 U.S. 993 (1984); *Flamer*, 490 A.2d at 139; *Garcia*, 664 P.2d at 978; *Williams*, 301 S.E.2d at 355; *Blake v. State*, 236 S.E.2d 637, 644 (Ga.), *cert. denied*, 434 U.S. 960 (1977).

■ We reject the death-eligible universe urged by the defendant. He contends that without comparing his death sentence to sentences imposed upon similar defendants who committed similar murders, regardless of whether such defendants were actually charged with capital murder, comparative proportionality review will not achieve its purpose of assuring evenhanded and consistent imposition of death sentences. The Supreme Court rejected a similar argument because it was based upon a fundamental misreading of *Furman. See Gregg*, 428 U.S. at 199 (plurality opinion); *Proffitt*, 428 U.S. at 254 (plurality opinion). The petitioners in *Gregg* and *Proffitt* argued that the arbitrary imposition of the death penalty prohibited by *Furman* is inherent in a penal system that allows for prosecutorial discretion in deciding whether to charge a capital offense, whether to seek the death penalty, and whether to accept a plea for a lesser offense. *See Gregg*, 428 U.S. at 199 (plurality opinion); *Proffitt*, 428 U.S. at 258 (plurality opinion). *Furman*, however, stands for the proposition that a death penalty statute must guide and channel the sentencing authority's discretion in a

manner that requires examination of the individual circumstances of the crime and the character and background of the defendant in order to protect defendants against the arbitrary and capricious, or wanton and freakish, imposition of the death penalty in accord with the Eighth and Fourteenth Amendments. *Gregg*, 428 U.S. at 199 (plurality opinion); *Proffitt*, 428 U.S. at 258 (plurality opinion). Thus, the focus of *Furman* is to protect criminal defendants from aberrant jury death verdicts and not to regulate discretionary stages in a penal system that remove them from consideration as candidates for the death penalty, or that afford them leniency. *See Gregg*, 428 U.S. at 199 (plurality opinion). Other avenues exist for defendants to challenge the propriety of prosecutorial decisions. *See State v. Monahan*, 125 N.H. 17, 26 (1984); *see also State v. Lawson*, 314 S.E.2d 493, 500-01 (N.C. 1984), *cert. denied*, 471 U.S. 1120 (1985); *Bland*, 958 S.W.2d at 666 n.17. Our rejection of the death-eligible universe is consistent with holdings in other jurisdictions that considered similar or identical statutory language. *Accord, e.g., Rhines*, 548 N.W.2d at 455; *Webb*, 680 A.2d at 210-12; *Battle*, 661 S.W.2d at 494; *Stamper*, 257 S.E.2d at 824.

■ We also reject the death-only universe. Although neither party advocates for this approach and the parties did not brief its merits, a significant number of death penalty jurisdictions have adopted it. We have thus considered this approach *sua sponte* and conclude that the legislature did not intend to restrict the case universe to those cases in which the jury imposed a death sentence. The plain language of RSA 630:5, XI(c) requires comparison of the defendant's "sentence of death" to "the *penalty imposed* in similar cases." (Emphasis added.) As earlier discussed, two penalties are possible under RSA 630:5: death or life imprisonment without possibility of parole. *See* RSA 630:5, IV. If the legislature had intended comparison cases to be restricted to a death-only universe, it would have inserted the word "death" before the word "penalty" so that we would determine whether a defendant's death sentence is "excessive or disproportionate" only in relation to "the [death] penalty imposed in similar cases, considering both the crime and the defendant." *See Kousounadis*, 159 N.H. at 423 (court will not add language that the legislature did not see fit to include).

■ Moreover, a death-only universe would hinder us from performing our comparative proportionality review function. In order to determine whether the defendant's death sentence is "excessive or disproportionate," we must discern whether there is a jury verdict pattern demonstrating that juries generally do not impose the death sentence in similar cases. *See Gregg*, 428 U.S. at 205-07 (plurality opinion). Considering only those capital murder cases in which juries actually imposed a death sentence would

impede our ability to determine whether juries that faced the decision whether to impose a death sentence generally did not do so.

Jurisdictions that rely upon a death-only universe have identified concerns about whether an expanded universe invites speculation into the comparative proportionality review process, thereby complicating or obscuring such review. *See Hunter v. State*, 8 So. 3d 1052, 1073 (Fla. 2008) (in rejecting a death-and-life-imprisonment universe and a death-eligible universe, the court held that "comparison of non-death sentence cases . . . to those where death was imposed would introduce factors completely unrelated to whether the sentence was 'unusual' " under state constitution), *cert. denied*, 129 S. Ct. 2005 (2009); *State v. Palmer*, 399 N.W.2d 706, 737 (Neb. 1986) (expanding universe beyond cases with sentences of death invites appellate court to enter into "intolerable speculation"), *cert. denied*, 484 U.S. 872 (1987); *Copeland*, 300 S.E.2d at 74-75 (court would enter a realm of pure conjecture if it attempted to compare and contrast life verdicts with an actual sentence of death because life verdicts represent acts of mercy and reflect the emphasis upon individualized sentencing); *Coleman v. State*, 378 So. 2d 640, 647-48 (Miss. 1979) (concluding that death-only universe is a "constitutionally adequate and judicially manageable" method and any expanded universe would cause proportionality review to be "never ending and the benchmark for comparison would be chronically undefined"). However, we conclude that based upon the plain language of RSA 630:5, XI(c) and the fair import of its terms, our legislature did not intend that the universe of similar cases be confined to a death-only universe. *See Williams*, 301 S.E.2d at 355 (comparing merits of death-only universe with death-and-life-imprisonment universe).

Turning to the substantive boundary of "similar cases," the parties generally agree that the pool of comparison cases is, in some manner, limited to the kind of capital murder for which a defendant was convicted; *i.e.*, knowingly causing the death of a law enforcement officer acting in the line of duty, RSA 630:1, I(a). The defendant argues that because the New Hampshire pool is "insufficiently large" for tier 1 review, we should compare all first degree murder convictions and, being mindful of dissimilarities, draw what guidance we may from the outcomes of those cases considering the "circumstances surrounding the killings, such as mental state and the degree of brutality or torture employed." For tier 2, the defendant argues that we should restrict our review to cases involving the same kind of capital murder as in this case. The State contends, however, that we should compare only cases "with a penalty hearing in which the defendant was convicted of the same statutory variant of capital murder as the case at bar." We consider the plain language of the statute to discern the

meaning intended by the legislature, *see Addison*, 159 N.H. at 91, and construe the statute according to the fair import of its terms and to promote justice, RSA 625:3.

As outlined earlier, the ordinary meaning of the term "similar" connotes that a defendant's death sentence be compared only to cases that share characteristics, substance or essentials that are common to or very much like the defendant's case. We turn to the death penalty statutory scheme itself to determine how the legislature identified the characteristics, substance or essentials (hereinafter "substantive characteristics") of a capital murder case that a jury must consider when making its sentencing decision after a hearing occurs under RSA 630:5.

As set forth by statute, the State can seek the death penalty only against those defendants who have committed the "offense of capital murder." RSA 630:5, I. The legislature has identified six kinds of capital murder in New Hampshire, with particular qualifications:

> I. A person is guilty of capital murder if he knowingly causes the death of:
>
>> (a) A law enforcement officer or a judicial officer acting in the line of duty or when the death is caused as a consequence of or in retaliation for such person's actions in the line of duty;
>>
>> (b) Another before, after, while engaged in the commission of, or while attempting to commit kidnapping as that offense is defined in RSA 633:1;
>>
>> (c) Another by criminally soliciting a person to cause said death or after having been criminally solicited by another for his personal pecuniary gain;
>>
>> (d) Another after being sentenced to life imprisonment without parole pursuant to RSA 630:1-a, III;
>>
>> (e) Another before, after, while engaged in the commission of, or while attempting to commit aggravated felonious sexual assault as defined in RSA 632-A:2;
>>
>> (f) Another before, after, while engaged in the commission of, or while attempting to commit an offense punishable under RSA 318-B:26, I(a) or (b).

II. As used in this section, a "law enforcement officer" is a sheriff or deputy sheriff of any county, a state police officer, a constable or police officer of any city or town, an official or employee of any prison, jail or corrections institution, a probation-parole officer, or a conservation officer.

II-a. As used in this section, a "judicial officer" is a judge of a district, probate, superior or supreme court; an attorney employed by the department of justice or a municipal prosecutor's office; or a county attorney; or attorney employed by the county attorney.

III. A person convicted of capital murder may be punished by death.

IV. As used in this section and RSA 630:1-a, 1-b, 2, 3 and 4, the meaning of "another" does not include a foetus.

V. In no event shall any person under the age of 18 years at the time the offense was committed be culpable of a capital murder.

RSA 630:1 (2007).

 Under RSA 630:5, a criminal defendant who commits a particular kind of capital murder, such as knowingly causing the death of a law enforcement officer acting in the line of duty, may be subject to a capital murder sentencing hearing. *Cf. Brett*, 892 P.2d at 68 ("Washington's statute . . . does not contain a myriad of capital crimes. It allows the death penalty only for one 'kind' of murder, premeditated first degree murder with aggravating circumstances."). Thus, for a capital murder case to be substantively "similar" to the death sentence on review, the defendant in the comparison case must have committed the same kind of capital murder as set forth in RSA 630:1. Accordingly, we hold that, in keeping with the plain language of the statute and the fair import of its terms, the pool of "similar cases" is limited to those in which the defendant committed the same kind of capital murder as the defendant whose death sentence is under review. *Gregg*, 428 U.S. at 206 (plurality opinion), 224 (White, J. concurring).

 We recognize that the substantive characteristics of "similar cases" also include aggravating and mitigating factors under RSA 630:5. Significantly, a jury considers whether to impose a death sentence for a particular kind of capital murder only if it unanimously finds predicate statutory aggravating factors beyond a reasonable doubt. *See* RSA 630:5, IV; RSA

630:5, VII (identifying aggravating factors). If the jury finds such factors, it must consider whether the aggravating factors sufficiently outweigh any mitigating factors, or in the absence of mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death. RSA 630:5, IV. Based upon this consideration, the jury, by unanimous vote only, may recommend that a sentence of death be imposed. RSA 630:5, IV. If it does so, the trial court must impose a sentence of death. RSA 630:5, V. Therefore, the kind of capital murder, along with the aggravating factors and any mitigating factors, creates the unique factual framework within which the jury determines whether death is the proper sentence; that is, the deathworthiness of the particular defendant for the particular crime committed. *See Gregg*, 428 U.S. at 197-98 (plurality opinion) (statutory aggravators and mitigators account for the particular circumstances of the crime and the background and character of the defendant). However, we conclude that the aggravating factors found by the jury and any mitigating factors considered are best accounted for when performing the mechanics of comparative proportionality review as discussed later in this opinion. *See Webb*, 680 A.2d at 215.

Our holding is generally in accord with other jurisdictions' substantive definitions of "similar cases." *Accord, e.g., Davis*, 318 S.W.3d at 643-45; *State v. Dunn*, 41 So. 3d 454, 474-75 (La. 2010); *Satcher*, 421 S.E.2d at 845; *State v. Artis*, 384 S.E.2d 470, 506 (N.C. 1989), *vacated and remanded on other grounds*, 494 U.S. 1023 (1990); *Colvin v. State*, 472 A.2d 953, 967-68 (Md.), *cert. denied*, 469 U.S. 873 (1984); *Lawson*, 314 S.E.2d at 503; *Garcia*, 664 P.2d at 978; *Coleman*, 605 P.2d at 1021.

In summary, considering both the procedural and substantive boundaries for "similar cases," the comparison case inventory is restricted to cases in which a defendant committed the same kind of capital murder as the defendant whose death sentence is under review, a separate sentencing hearing occurred, the jury unanimously found predicate aggravating factors, and the penalty imposed was either death or life imprisonment without possibility of parole.

## IX

Having determined the meaning of "similar cases" for purposes of creating a comparison case inventory, we address the mechanics of performing comparative proportionality review. Because we must determine whether the defendant's death sentence is "excessive or disproportionate," the mechanics for reviewing the inventory of similar cases must enable us to discern whether there is a pattern demonstrating that juries generally do not impose a death sentence in similar cases, "considering both the crime and the defendant."

Since *Furman*, two basic methods have developed for conducting comparative proportionality review: the qualitative, precedent-seeking method, and the quantitative, frequency method. *See, e.g., Bland*, 958 S.W.2d at 664; *Webb*, 680 A.2d at 209. Although "[b]oth approaches share a common goal which is to determine whether a particular sentence is disproportionate to the sentences imposed for similar crimes and similar defendants," they "are fundamentally different in principle and application." *Bland*, 958 S.W.2d at 664; *see Webb*, 680 A.2d at 209.

Generally stated, under the qualitative, precedent-seeking method, the appellate court compares the specific case before it to other cases in which defendants were convicted of the same or similar capital murders, by examining all of the circumstances of the murder and the characteristics and background of the defendant for each case in the "similar cases" inventory. *See Bland*, 958 S.W.2d at 664; *Webb*, 680 A.2d at 209. In contrast, the quantitative, frequency method involves statistical analysis, which seeks to mathematically quantify the various factors leading to the imposition, or non-imposition, of the death penalty, and the frequency with which the death penalty is imposed in certain circumstances. *See Bland*, 958 S.W.2d at 664; *State v. Marshall*, 613 A.2d 1059, 1076-82 (N.J. 1992), *cert. denied*, 507 U.S. 929 (1993); *Papasavvas*, 790 A.2d at 805. Specifically, this method involves isolating capital murder cases into categories based upon certain aggravating and mitigating factors to assess the frequency with which the death penalty is or is not imposed for capital crimes within each category. *See, e.g., Papasavvas*, 790 A.2d at 805.

The defendant urges us to adopt both qualitative and quantitative comparison methods. The defendant advocates for the court to supplement qualitative, precedent-seeking review by using two quantitative measures: the frequency method and a culpability ranking method. He contends that application of these quantitative measures can be used to establish the threshold for assessing whether his penalty is proportional to penalties imposed in similar cases. The State argues that the legislature intended a qualitative, precedent-seeking method as the exclusive approach for conducting comparative proportionality review. We agree with the State.

The plain language of RSA 630:5, XI(c) anticipates that we conduct comparative proportionality review in a fact-specific manner by "considering both the crime and the defendant." The precedent-seeking method fulfills this statutory prescription and accords with the individualized sentencing considerations that juries are required to engage in when deciding whether to impose the death penalty. *See Williams*, 301 S.E.2d at 355. Also, quantitative, statistical approaches had not yet surfaced in published comparative proportionality review jurisprudence in 1977, the

year that the legislature enacted RSA 630:5, XI(c) when it revised New Hampshire's death penalty scheme. *See Bland*, 958 S.W.2d at 664; *Williams*, 301 S.E.2d at 355. Moreover, in *Gregg*, the Supreme Court's description of Georgia's comparative proportionality provision suggests that the appellate function incorporated a fact-specific analysis, consistent with a precedent-seeking approach traditionally employed by appellate courts. *See Gregg*, 428 U.S. at 198, 205 (plurality opinion). As set forth earlier in this opinion, our legislature sought to comply with this federal jurisprudence when it revised the death penalty statute in 1977.

By its very nature, a quantitative, statistical method could not serve as a substitute for individualized judicial assessment of similar cases afforded by the precedent-seeking approach. *See Williams*, 301 S.E.2d at 355. Indeed, a statistical method that compartmentalizes capital murder cases into categories may actually obscure, or at least unnecessarily complicate, the appellate task of reviewing a death sentence imposed under a process that accounts for all of the individual circumstances of the particular murder and the particular defendant. *See Bland*, 958 S.W.2d at 665 ("If a reviewing court allowed its comparative proportionality analysis to be governed by statistical and quantitative analysis, the concept of 'individualized consideration' [for death penalty cases] . . . would be frustrated."); *Webb*, 680 A.2d at 209 (noting that the frequency, statistical method has been criticized as an unworkable attempt to "quantify the unquantifiable"); *Artis*, 384 S.E.2d at 506 (court must independently evaluate individual defendant and nature of crime committed to conduct factual comparison).

Jurisdictions that have employed statistical methodology to conduct comparative proportionality review did not supplant the precedent-seeking method. Rather, they used the statistical methodology to supplement their precedent-seeking analysis while placing greater weight on the latter. *See, e.g., State v. Morton*, 757 A.2d 184, 191-92 (N.J. 2000), *cert. denied*, 532 U.S. 931 (2001); *Papasavvas*, 790 A.2d at 807; *see also State v. Pirtle*, 904 P.2d 245, 277 (Wash. 1995), *cert. denied*, 518 U.S. 1026 (1996). We are not convinced that a quantitative, statistical method would add value to the review process beyond that already accounted for under the qualitative, precedent-seeking approach. *See Williams*, 301 S.E.2d at 355-56 (identifying risks associated with adopting a statistical method of comparative proportionality review); *Bland*, 958 S.W.2d at 665 ("our function in performing comparative review is not to search for proof that a defendant's death sentence is perfectly symmetrical, but to identify and invalidate the aberrant death sentence").

We hold that the precedent-seeking approach for conducting comparative proportionality review is consistent with the plain language

and fair import of RSA 630:5, XI(c). Other jurisdictions have reached a similar conclusion based upon similar or identical statutory language. *See, e.g., Godsey*, 60 S.W.3d at 785; *Bland*, 958 S.W.2d at 665; *Williams*, 301 S.E.2d at 355-56.

In applying the precedent-seeking approach to the inventory of "similar cases," we will survey the case inventory and examine each case "considering both the crime and the defendant," RSA 630:5, XI(c). In doing so, we will determine whether a germane jury pattern emerges demonstrating that the defendant's death sentence is excessive or disproportionate; that is, whether juries generally do not impose a death sentence in capital murder cases similar to the defendant's case. This process is not limited to a comparison of the aggravating and mitigating factors between the defendant's case and each case in the inventory, or a calculation of the number of death and life imprisonment verdicts. *See Artis*, 384 S.E.2d at 505 (numerical disparity between life and death verdicts among categories of murders similar to the defendant's case is not dispositive on proportionality review). Rather, we will review the particular facts underlying the substantive characteristics of the case (the nature and circumstances of the capital murder, the aggravating factors, and any mitigating factors). These characteristics found by the jury establish the unique footprint of the case within which the jury considered the particular circumstances of the crime and the character and background of the particular defendant to decide whether to impose the death penalty or life imprisonment without possibility of parole.

Because the defendant's death sentence is the baseline for comparison, we will first review the entire record of the defendant's case to gain a complete picture of the facts and circumstances underlying the substantive characteristics of the case. *See, e.g., Bordelon*, 33 So. 3d at 868 (comparative proportionality review is "a cumulative process which focuses on a combination of factors including the nature of the offense and the offender" (quotation, ellipses and brackets omitted)); *Godsey*, 60 S.W.3d at 782 ("We examine the facts of the crimes, the characteristics of the defendants, and the aggravating and mitigating factors involved."); *State v. Bacon*, 446 S.E.2d 542, 563 (N.C. 1994) (court considers all of the circumstances of the case including the manner in which the defendant committed the crime, as well as defendant's character, background, and physical and mental condition), *cert. denied*, 513 U.S. 1159 (1995). Then, we will review the published decisions in each case in the "similar cases" inventory to gain an understanding of the facts and circumstances underlying the substantive characteristics of each case.

■■■ Considering the particular facts and circumstances through the lens of the substantive characteristics found by the jury in each case, we will determine whether a germane pattern of verdicts exists demonstrating that the defendant's death sentence is "excessive or disproportionate." *See Bland*, 958 S.W.2d at 665 (a meaningful difference may exist between cases that reveal a basis for a sentence less than death).

> If . . . we find that juries have consistently been returning death sentences in the similar cases, then we will have a strong basis for concluding that a death sentence in the case under review is not excessive or disproportionate. On the other hand if we find that juries have consistently been returning life sentences in the similar cases, we will have a strong basis for concluding that a death sentence in the case under review is excessive or disproportionate.

*Bacon*, 446 S.E.2d at 563 (quotation omitted).

■■ Ultimately, we will not vacate a death sentence as "excessive or disproportionate" unless it is aberrant from, or substantially out of line with, a pattern of jury verdicts which demonstrate that juries generally do not impose death in similar cases. *See Gregg*, 428 U.S. at 205 (plurality opinion) (comparative proportionality review ensures that "if the death penalty is only rarely imposed for an act or it is substantially out of line with sentences imposed for other acts it will be set aside as excessive" (quotation omitted)); *see also Bland*, 958 S.W.2d at 665 (even when meaningful difference is not apparent, a life verdict in one case does not render disproportionate the reasoned and controlled decision to impose death in another similar case); *Brett*, 892 P.2d at 69 (court holding that unless and until juries consistently decline to impose a death sentence in similar cases, specific instances in which a jury rendered a life imprisonment verdict will not establish that a defendant's death is excessive or disproportionate); *Bacon*, 446 S.E.2d at 566 ("fact that one, two, or several juries have returned recommendations of life imprisonment in cases similar to the one under review does not automatically establish that juries have 'consistently' returned life sentences in factually similar cases" (quotation omitted)).

■■ Caution is warranted when considering the number and nature of aggravating factors, and any mitigating factors, involved in the inventory case. *See, e.g., State v. Lord*, 822 P.2d 177, 223 (Wash. 1991) (simply comparing numbers of victims or other aggravating factors may superficially make two cases appear similar, yet mitigating circumstances in one case may explain jury's verdict not to impose the death penalty), *cert.*

*denied*, 506 U.S. 856 (1992). Some of the aggravating and mitigating factors identified in RSA 630:5, VI-VII, relate to the nature of the crime committed by the defendant, while others relate to the defendant's background and character apart from the particular crime itself. The statute does not rank by relative culpability the types of capital murder under RSA 630:1 in relation to the aggravating and mitigating factors under RSA 630:5. Rather, all types of capital murder, with at least two aggravating factors found beyond a reasonable doubt are, according to legislative judgment, equally subject to the death penalty.

 Even when cases in the inventory share common aggravating or mitigating factors with the case on appeal, the facts underlying the factors may reveal meaningful differences. *See Bland*, 958 S.W.2d at 665. It is left to the jury to determine the deathworthiness of a particular defendant in light of the circumstances of that crime and the character and background of that defendant, informed by the particular aggravating factors and any mitigating factors found in the case. Because the jury's findings on the substantive characteristics of a capital murder case give context for its determination of the deathworthiness of a certain kind of murder, a reliable and meaningful comparative proportionality review process must account for all of the substantive characteristics found by the jury.

 Finally, comparative proportionality review is not a search for perfect symmetry or a mechanism for requiring uniformly consistent results. *See Bordelon*, 33 So. 3d at 868; *State v. Rimmer*, 250 S.W.3d 12, 36 (Tenn.), *cert. denied*, 129 S. Ct. 111 (2008); *Bland*, 958 S.W.2d at 665; *Webb*, 680 A.2d at 204. Perfect symmetry and uniform consistency are not possible under a statutory scheme that requires juries to make individualized sentencing decisions based upon the unique circumstances of a case, given the nature of the crime and the character and background of the defendant. *See Bordelon*, 33 So. 3d at 868; *see also Brett*, 892 P.2d at 69 ("There is no constitutional or statutory requirement to ensure an unattainable degree of identity among particular cases which are invariably unique."). Ultimately, no two capital murder defendants are alike. Indeed, some discord may exist between the statutory notion of comparative proportionality review considering "similar cases" and the Eighth Amendment constitutional requirement for individualized sentencing in the imposition of death sentences. *See Rhines*, 548 N.W.2d at 457; *State v. Creech*, 670 P.2d 463, 470 (Idaho 1983), *cert. denied*, 465 U.S. 1051 (1984); *Copeland*, 300 S.E.2d at 72. "From a logical stand point, of course, that which is unique is also incommensurable." *Copeland*, 300 S.E.2d at 72.

> [C]omparative [proportionality] review cannot be permitted to diminish the particularized qual[it]y of sentencing, since the latter

is now an absolute command of the [United States] Constitution. By the same token, the final resolution of a given appeal, if sentence is to be affirmed, should rest upon the unique correctness of the result in the given instance rather than its coarse resemblance to other cases.

*Id.* Despite this inherent tension, our holdings today provide an objective framework for conducting statutory comparative proportionality review under RSA 630:5, XI(c).

We agree with the parties that neither bears the burden of proof on comparative proportionality review. The statute requires us to conduct an independent review. RSA 630:5, XI(c). This inquiry is a question of law that we must definitively decide *de novo*, and it is not amenable to traditional burdens of proof. *See Webb*, 680 A.2d at 208 ("We cannot fail to decide the question by resort to traditional notions of burdens of persuasion." (emphasis omitted)).

Our role under RSA 630:5, XI(c) is limited to determining whether the death sentence imposed upon the defendant is "excessive or disproportionate" as compared to "the penalty imposed in similar cases, considering both the crime and the defendant." *See, e.g., Bland*, 958 S.W.2d at 668 ("The appellate task under [the state's comparative proportionality review statute] is to compare similar cases, not to gauge, in isolation, the culpability of a specific defendant or the heinousness of a particular crime."). Under New Hampshire's capital punishment scheme, the jury bears the sole responsibility to determine whether the appropriate sentence, in light of the circumstances of the particular murder and of the background and character of the defendant, is death or life imprisonment without possibility of parole. *See* RSA 630:5, IV, V. "[O]ne of the most important functions any jury can perform in exercising its discretion to choose between life imprisonment and capital punishment is to maintain a link between contemporary community values and the penal system." *Woodson*, 428 U.S. at 295 (plurality opinion) (quotations omitted); *see also Gregg*, 428 U.S. at 190 (plurality opinion).

## X

Our ability to conduct comparative proportionality review in the present case is complicated by practical realities. No other defendant has been convicted of a capital crime and sentenced to death in New Hampshire during the post-*Furman* era. Further, since the legislature revised the death penalty statute in 1977, there has been only one previous case in which the State sought the death penalty and a separate sentencing

hearing occurred. *See State of New Hampshire v. Brooks*, No. 2008-0875 (N.H.) (appeal pending). In *Brooks*, the defendant was convicted of capital murder and the jury imposed a sentence of life imprisonment without possibility of parole. That capital murder case, however, did not involve the killing of a law enforcement officer acting in the line of duty.

■ The defendant's sentence of death is thus the first sentence subject to comparative proportionality review under RSA 630:5, XI(c). This circumstance, however, does not by itself signify that his death sentence is excessive or disproportionate under RSA 630:5, XI(c). *See Rhines*, 548 N.W.2d at 457 ("[T]he fact that [the defendant] is among the first to receive a death sentence does not signify that his sentence is disproportionate. Otherwise, the death penalty itself would be nullified."). Nor does it render the comparative proportionality provision ineffective or inoperative. *Cf. Tichnell*, 468 A.2d at 21 (court holding that dissimilarities among cases and limitations of in-state case inventory "does not mean that we cannot complete the comparative review process mandated [by statute]").

Other state supreme courts conducting comparative proportionality review for the first time in post-*Furman* death penalty cases have taken different approaches. Some states have compared pre-*Furman* cases. *See, e.g., Jones v. State*, 648 P.2d 1251, 1260 (Okla. Crim. App. 1982), *cert. denied*, 459 U.S. 1155 (1983); *Gall v. Com.*, 607 S.W.2d 97, 113-14 (Ky. 1980), *cert. denied*, 450 U.S. 989 (1981), *and overruled on other grounds by Payne v. Com.*, 623 S.W.2d 867, 870 (Ky. 1981); *Smith v. Com.*, 248 S.E.2d 135, 151 (Va. 1978), *cert. denied*, 441 U.S. 967 (1979). The *Gregg* court endorsed this approach, remarking, "This practice [of examining pre-*Furman* cases] was necessary at the inception of the new [comparative proportionality] procedure in the absence of any post-*Furman* capital cases available for comparison. It is not unconstitutional." *Gregg*, 428 U.S. at 204-05 n.56 (plurality opinion). Other states have compared cases decided under former death penalty statutes. *See, e.g., Creech*, 670 P.2d at 476 (comparing cases in which the death sentences were vacated due to the unconstitutional mandatory imposition of the death sentence, and also pre-*Furman* cases).

Still other courts have declined to perform comparative proportionality review for a death sentence that represented the first of its kind in the post-*Furman* era. *See, e.g., State v. Shaw*, 255 S.E.2d 799, 807 (S.C.), *cert. denied*, 444 U.S. 957 (1979), *and overruled on other grounds by State v. Torrence*, 406 S.E.2d 315, 329 n.5 (S.C. 1991); *see also State v. Felde*, 422 So. 2d 370, 398 (La. 1982) ("there are no similar cases, and this sentence cannot be held disproportionate to sentences in other cases"), *cert. denied*, 461 U.S. 918 (1983). For example, in *State v. Shaw*, the South Carolina Supreme Court was required to conduct appellate review under a statutory com-

parative proportionality review provision containing identical language to RSA 630:5, XI(c). *Shaw*, 255 S.E.2d at 806-07. In reviewing the death sentences imposed upon two defendants convicted of capital murder, the court noted, "We have compared the death sentences imposed upon appellants with the sentences imposed in all prior capital cases tried under the current death penalty statutes and are satisfied that there are no similar cases against which the proportionality of the sentences imposed upon appellants can be measured." *Id.* at 807 (footnote omitted). It concluded that:

> The inability of this Court to compare this case with any other similar cases does not require, however, that appellants' sentences be set aside. Any system of review that requires a comparison of each case with all similar prior cases must have a beginning. There will be a first case for each type or category of capital case that may appear and that first case necessarily cannot be compared to any other similar cases. The first case must stand alone, otherwise comparative sentence review would be forever impossible.

*Id.* The court affirmed the death sentences because the state's death penalty scheme complied with the constitutional guidelines outlined in *Gregg*, and because it had "considered and overruled each assignment of error by appellants," "completed the statutorily mandated sentence review," and "searched the record . . . for any prejudicial error and . . . found none." *Id.*; *see Copeland*, 300 S.E.2d at 77 (court concluded that no similar case exists that would permit meaningful comparative review of the death sentences before it for review but nonetheless concluded that the sentences were appropriate and neither excessive nor disproportionate).

Moreover, some courts have considered only in-state cases for purposes of comparative proportionality review, reasoning that reviewing cases from other states would "result in the comparison of death sentences that rest upon differing considerations and standards." *Hunter*, 8 So. 3d at 1073 (performing proportionality review under state constitution). And another court reasoned that "[i]n its jurisprudential history there is no indication that comparative proportionality review was to be conducted on a national scale," and that "given that capital sentencing statutes differ from state to state, cases from other jurisdictions are likely not 'similar' for purposes of comparative proportionality review." *Godsey*, 60 S.W.3d at 786.

Other courts, however, have compared cases from other jurisdictions to conduct comparative proportionality review when no or limited similar in-state cases are available. *See, e.g.*, *State v. Vickers*, 768 P.2d 1177, 1191-92 (Ariz. 1989), *cert. denied*, 497 U.S. 1033 (1990); *Hopkinson v. State*, 664 P.2d

43, 88-91 (Wyo.), *cert. denied*, 464 U.S. 908 (1983), *and superseded by rule as stated in Grainey v. State*, 997 P.2d 1035, 1040 (Wyo. 2000); *Bell v. State*, 360 So. 2d 1206, 1214 (Miss. 1978), *cert. denied*, 440 U.S. 950 (1979). For example, in *Hopkinson v. State*, in undertaking its comparative proportionality review function under a statutory provision identical to RSA 630:5, XI(c), the Wyoming Supreme Court noted, "Since the passage of this statute, there have been no other similar cases in this state." *Hopkinson*, 664 P.2d at 88. The court reviewed the facts of two in-state, post-*Furman* cases in which death sentences had been imposed but were subsequently vacated because the mandatory death penalty statute was declared unconstitutional. *Id.* at 89-90. It observed that the in-state cases had limited value because "jury discretion was out of the picture" and thus "[t]he cases can only be compared as to circumstances in which a jury was willing to and did return a verdict of the death penalty." *Id.* at 90. To conduct its comparison analysis, therefore, the court reviewed decisions from Florida and Georgia, stating that "[t]he decisions from the courts of other states, from whence came the legislation under consideration, are very persuasive when applying statutes which are identical or very similar to those enacted by our own legislature." *Id.*

Likewise, in *Bell v. State*, when reviewing the defendant's death sentence, the Mississippi Supreme Court was required to undertake a "[c]omparison to similar cases to insure that the death sentence is not inflicted in a wanton or freakish manner but in a consistent and evenhanded manner." *Bell*, 360 So. 2d at 1211. The court's survey of in-state cases revealed that the last capital punishment effected in the state was in 1964 and that in the nine years prior to that, there were twenty cases affirming the death sentence for the crime of murder. *Id.* at 1214. The court reviewed those cases and confirmed that imposition of the death penalty would not be wanton or arbitrary under the circumstances before it. *Id.* However, given the dated character of the in-state cases reviewed (1954-1963) and the fact that the prior penalties were imposed without full consideration of aggravating and mitigating factors as was required under the current statute, the court elected to review similar cases in other jurisdictions that had approved the penalty imposed and cited five cases from Arizona, Florida, Georgia and Texas. *Id.* at 1214-15. The court concluded, "Based upon the legislative determination as expressed in our capital murder statute, our previous cases where the death penalty was upheld, and a survey of similar cases in other jurisdictions, we cannot say that the punishment here given is disproportionate to the crime committed." *Id.* at 1215.

In the case before us, both the State and the defendant argue that we should rely upon out-of-state cases to conduct comparative proportionality

review. RSA 630:5, XI(c) is silent on the jurisdictional scope of "similar cases." As discussed earlier, comparative proportionality review is not constitutionally required under the Eighth Amendment to the United States Constitution, and, thus, "the contours of proportionality review . . . have been left to state determination since the [United States] Supreme Court has declined to impose any specific model of review upon the states." *Copeland*, 300 S.E.2d at 74.

 Most states conduct comparative proportionality review with an in-state comparison case inventory. *See Tichnell*, 415 A.2d at 854. We agree that in-state case comparison is preferable. Local jury verdicts best express contemporary community values regarding whether the punishment of death is appropriate for a particular crime committed by a particular defendant. *See Woodson*, 428 U.S. at 295 (when choosing between life imprisonment and capital punishment, jury functions "to maintain a link between contemporary community values and the penal system" (quotation omitted)). However, the case before us presents the first New Hampshire death sentence that has been imposed upon a defendant since the capital punishment sentencing scheme was enacted after *Furman* and *Gregg* and is the first death sentence subject to comparative proportionality review under RSA 630:5, XI(c). We must construe provisions of the Criminal Code "according to the fair import of their terms and to promote justice." RSA 625:3. Accordingly, in this case we will consider published opinions of out-of-state cases to the extent such comparison would be meaningful for performing comparative proportionality review under the framework set forth in this opinion. If New Hampshire's death penalty jurisprudence develops beyond this first death penalty case of its kind, we may in the future find it unnecessary to consider out-of-state cases for purposes of comparative proportionality.

 Our holding today provides an objective basis for meaningfully conducting the statutory comparative proportionality component of our mandatory appellate review under RSA 630:5, XI(c). Death is different in kind from all other forms of punishment, and meaningful appellate review is a crucial safeguard to ensure that the death penalty is not imposed in an arbitrary and capricious, or wanton and freakish, manner. *See Gregg*, 428 U.S. at 187 (plurality opinion) ("death as a punishment is unique in its severity and irrevocability"); *Furman*, 408 U.S. at 306 (Stewart, J., concurring) ("death differs . . . not in degree but in kind"). Comparative proportionality review under RSA 630:5, XI(c) is one part of the appellate process afforded defendants in this state convicted of capital murder and sentenced to death. Defendants have a right to appeal the merits of the conviction and sentence. Additionally, mandatory appellate review itself

requires that we focus upon the specific jury, evidence and sentencing verdict in the defendant's case, RSA 630:5, XI(a), (b), and then take a broader view of the defendant's case in relation to other sentencing verdicts rendered by juries who have faced similar defendants convicted of similar crimes, RSA 630:5, XI(c). Comparative proportionality review is, thus, the final step in a full appellate process encompassing a defendant's direct appeal and mandatory appellate review of both the capital murder conviction and the death sentence. We will be "particularly sensitive to insure that every safeguard is observed." *State v. Johnson*, 134 N.H. 570, 577 (1991); *see Parker v. Dugger*, 498 U.S. 308, 321 (1991) (meaningful appellate review plays a crucial role "in ensuring that the death penalty is not imposed arbitrarily or irrationally").

*So ordered.*

DALIANIS, DUGGAN, HICKS and CONBOY, JJ., concurred.