NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Hillsborough - northern judicial district
No. 2008-945


THE STATE OF NEW HAMPSHIRE

v.

MICHAEL ADDISON
(CAPITAL MURDER — PROPORTIONALITY REVIEW)

Argued: January 15, 2015
Opinion Issued: April 30, 2015


Joseph A. Foster, attorney general (Jeffery A. Strelzin, senior assistant attorney general, and John J. Kennedy, assistant attorney general, on the brief, and Mr. Strelzin orally), for the State.


David M. Rothstein, deputy director public defender, and Christopher M. Johnson, chief appellate defender, of Concord, on the brief, and Mr. Rothstein orally, for the defendant.


PER CURIAM. In 2008, the defendant, Michael Addison, was convicted of the 2006 capital murder of Manchester Police Officer Michael Briggs and sentenced to death. We subsequently affirmed the defendant's conviction for capital murder, concluding that his sentence was not imposed under the influence of passion, prejudice or any other arbitrary factor, and that the

evidence was sufficient to support the jury's findings of aggravating circumstances.  State v. Addison (Capital Murder), 165 N.H. 381, 412 (2013); see RSA 630:5, X-XII (2007).  At this final stage of our mandatory review, we are required by statute to address "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."  RSA 630:5, XI(c).  We conclude that the defendant's sentence is neither excessive nor disproportionate and, accordingly, affirm his sentence of death.

In State v. Addison, 160 N.H. 732 (2010) (hereinafter, Proportionality Framework), we set forth the parameters and mechanics of comparative proportionality review under RSA 630:5, XI(c).  After reviewing the relevant jurisprudential background and the specific language of RSA 630:5, XI(c), we held that "a death penalty is 'excessive or disproportionate' if it is aberrant from, or substantially out of line with, a pattern of jury verdicts which demonstrate that juries generally do not impose death in similar cases."  Proportionality Framework, 160 N.H. at 761.  "This appellate monitoring function serves to ensure that defendants will not incur a death sentence that is arbitrary and capricious, or wanton and freakish, in relation to penalties imposed by juries in similar cases, considering both the crime and the defendant."  Id.

We construed the procedural and substantive boundaries of "similar cases" as limited to those cases in which the defendant committed the same kind of capital murder; a separate sentencing hearing occurred; the jury found predicate aggravating factors; and the penalty imposed was either death or life imprisonment without possibility of parole.  Id. at 769.  As to the mechanics of comparative proportionality review, we adopted a precedent-seeking approach, under which we would examine each case in the inventory of similar cases "considering both the crime and the defendant."  Id. at 772 (quotation omitted).

> In doing so, we will determine whether a germane jury pattern emerges demonstrating that the defendant's death sentence is excessive or disproportionate; that is, whether juries generally do not impose a death sentence in capital murder cases similar to the defendant's case.  This process is not limited to a comparison of the aggravating and mitigating factors between the defendant's case and each case in the inventory, or a calculation of the number of death and life imprisonment verdicts.  Rather, we will review the particular facts underlying the substantive characteristics of the case (the nature and circumstances of the capital murder, the aggravating factors, and any mitigating factors).  These characteristics found by the jury establish the unique footprint of the case within which the jury considered the particular circumstances of the crime and the character and background of

the particular defendant to decide whether to impose the death penalty or life imprisonment without possibility of parole.

Id. (citation omitted).

Noting that our ability to conduct comparative proportionality review in this case is complicated by the practical reality that no other defendant has been convicted of a capital crime and sentenced to death in this state since the legislature adopted the current death penalty statute in 1977, we concluded that we would consider published opinions from out-of-state cases "to the extent such comparison would be meaningful." Id. at 779. Because the defendant in any comparison case must have killed a law enforcement officer acting in the line of duty, the capital murder case of State v. Brooks is not included in the inventory of similar cases. See State v. Brooks, 164 N.H. 272, 275-76 (2012) (defendant convicted of capital murder involving solicitation, capital murder in the course of kidnapping, first degree murder as an accomplice, and conspiracy to commit capital murder).

Comparative proportionality review is not a constitutional mandate, but, rather, is a creature of statute. See Pulley v. Harris, 465 U.S. 37, 45-46 (1984). Our mandatory appellate review

"serves as a check against the random or arbitrary imposition of the death penalty. In particular, the proportionality review substantially eliminates the possibility that a person will be sentenced to die by the action of an aberrant jury. If a time comes when juries generally do not impose the death sentence in a certain kind of murder case, the appellate review procedures assure that no defendant convicted under such circumstances will suffer a sentence of death."

Proportionality Framework, 160 N.H. at 744 (quoting Gregg v. Georgia, 428 U.S. 153, 206 (1976)). Our task under proportionality review "[is] not to determine whether the capital case before [us] in some way [is], on a scale of moral blameworthiness, roughly equivalent to all other capital cases and, absent such rough equivalence, to reverse the sentence." Id. at 761 (quotation omitted). "Nor [is] that review considered to require that the capital case before the court must affirmatively be shown, on such a scale, to have been quantitatively different from all other cases in which the death penalty was not imposed and, absent such an affirmative showing, to reverse the sentence." Id. (quotation omitted). Rather, the question before us is whether the death penalty imposed in this case is "aberrational . . . with respect to similar cases." Id. (quotation omitted).

Comparative proportionality review is a question of law that we decide de novo. Id. at 775. Neither party bears the burden of proof. Id. We conduct our

3

review in accordance with the analysis adopted in the <u>Proportionality Framework</u> decision, with additional modification and clarification as explained below.

The defendant asserts that we should reassess three areas of the <u>Proportionality Framework</u> decision, including: (1) the limitation on reviewing only cases which resulted in a published opinion; (2) the reliance upon mitigating factors in comparison cases; and (3) the rejection of the "quantitative analysis" approach. As to the published decision limitation, the defendant suggests that, if we have enough information to conduct a comparison, unpublished opinions should not be excluded from the comparison universe. The State "does not categorically reject the notion that this Court might look to sources other than published out-of-state opinions," asserting that "[w]hile a decision that has not been designated for publication may not carry legal precedence, the underlying facts recounted in the opinion are no less valuable in conducting a comparative proportionality review." We agree with the parties and will consider unpublished opinions accessible on either the Westlaw or Lexis legal databases, to the extent that such opinions contain sufficient information that they are meaningful for purposes of comparative proportionality review.

Regarding mitigating factors in comparison cases, the defendant asks us to "reassess the use of mitigating evidence as a comparative tool" because "[n]either the published opinions that serve as the Court's primary sources for information, nor newspaper articles, typically include detailed summaries of mitigating evidence." He argues that comparing mitigating factors requires sufficient information to permit this court to assess the correlation between different categories of mitigating factors and either a life or death sentence, and that it is "not possible to consistently obtain the details of the mitigation evidence presented in the majority of out-of-state capital murder cases from either published opinions or other sources." The State disagrees, arguing that "[t]he defendant's effort to jettison mitigation evidence from the proportionality analysis should be rejected" because doing so would be contrary to the statutory mandate that we determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." RSA 630:5, XI(c). The State asserts that taking into account mitigating evidence "goes directly to the background and character of the defendant."

As we have stated, the process of conducting proportionality review "is not limited to a comparison of the aggravating and mitigating factors between the defendant's case and each case in the inventory, or a calculation of the number of death and life imprisonment verdicts." <u>Proportionality Framework</u>, 160 N.H. at 772. Rather, we consider "the nature and circumstances of the capital murder, the aggravating factors, and any mitigating factors," and determine whether a pattern of verdicts demonstrates that the defendant's

4

death sentence is excessive or disproportionate.  Id. at 761.  We noted in Proportionality Framework that "[c]aution is warranted when considering the number and nature of aggravating factors, and any mitigating factors" involved in the comparison case inventory, because "[i]t is left to the jury to determine the deathworthiness of a particular defendant in light of the circumstances of that crime and the character and background of that defendant."  Id. at 773, 774.  Although we recognize that mitigating factors do not exist in every case, the absence of such factors does not render an otherwise "similar case" meaningless to our review.

The defendant also argues that we should reassess our rejection of the "quantitative analysis" approach, and he proposes a combined qualitative and quantitative methodology.  He asserts that we should employ "simple frequency calculations using culpability factors in light of the size of the universe, the recurrence of factors common to cases in the universe, and the use of culpability factors to distinguish cases similar to those used in [other] states."  The defendant provides a spreadsheet that identifies 13 factors that he argues "tended to appear in capital murder cases in which the defendant killed a law enforcement officer acting in the line of duty," and he assigns a numerical value to each factor to determine the frequency with which juries tended to impose life or death sentences in approximately 350 cases, depending upon the presence or absence of the identified factors.  In this manner, the defendant asserts that "[h]is case bears the characteristics of those in which defendants were sentenced to life, and is an outlier when compared to cases in which defendants were sentenced to death."  The State argues that the defendant's "statistical, mathematical approach to comparative proportionality review stands in direct contrast" to the qualitative, precedent-seeking approach we adopted in Proportionality Framework, and that his approach should be rejected because it "fails to establish any unique footprint of the comparison cases or the defendant's case."

We have rejected employing a quantitative, frequency method involving statistical analysis "which seeks to mathematically quantify the various factors leading to the imposition, or non-imposition, of the death penalty, and the frequency with which the death penalty is imposed in certain circumstances."  Id. at 770.  We specifically declined to adopt a method of comparative proportionality review that "involves isolating capital murder cases into categories based upon certain aggravating and mitigating factors to assess the frequency with which the death penalty is or is not imposed for capital crimes within each category."  Id.  In doing so, we noted that such a method "may actually obscure, or at least unnecessarily complicate, the appellate task of reviewing a death sentence imposed under a process that accounts for all of the individual circumstances of the particular murder and the particular defendant."  Id. at 771.  We reaffirm that "[t]he plain language of RSA 630:5, XI(c) anticipates that we conduct comparative proportionality review in a fact-specific manner by 'considering both the crime and the defendant,'" and that

5

the precedent-seeking approach to comparative proportionality review "accords with the individualized sentencing considerations that juries are required to engage in when deciding whether to impose the death penalty." Id. at 770.

Turning to the parameters of "similar cases," we note at the outset that the State contends that Proportionality Framework could be interpreted to include only the defendant's case in the comparison universe because "New Hampshire appears to be the only jurisdiction whose capital murder statute requires a knowing mental state to be proven as a prerequisite for a capital murder conviction." Thus, the State asserts, because the defendant's sentence is the first sentence subject to comparative proportionality review, there are no similar cases and his sentence cannot be held to be disproportionate. The defendant disagrees, arguing that a "one-case universe" approach is contrary to the language of RSA 630:5, XI(c), which requires that we consider the "penalty imposed in similar cases," and would leave us unable to fulfill our appellate review obligation until another similar in-state case arises. Although we observed in Proportionality Framework that in-state case comparison is preferable because "[l]ocal jury verdicts best express contemporary community values regarding whether the punishment of death is appropriate for a particular crime committed by a particular defendant," we, nonetheless, determined that until "New Hampshire's death penalty jurisprudence develops beyond this first death penalty case of its kind," it is necessary to consider out-of-state cases for purposes of comparative proportionality review. Id. at 779.

Recognizing that "the language and tenor" of Proportionality Framework "indicate that [this court] did not intend to limit the universe to a single case," the State identifies a comparison universe of 10 cases drawn from four jurisdictions in which a defendant can be charged with capital murder for "intentionally or knowingly," or "purposely or knowingly," killing a law enforcement officer acting in the line of duty. Comparing this case with those cases, the State argues that, "[t]aking into account . . . all the aggravating factors proven at trial, the facts of the murder itself, and the lack of compelling mitigating factors . . . , it would have been an aberration for the defendant's jury not to have imposed the death penalty."*

---

* In this case, the jury found the following statutory aggravating factors: (1) the defendant purposely inflicted serious bodily injury that resulted in the death of Officer Michael Briggs; and (2) the defendant murdered Officer Michael Briggs for the purpose of avoiding or preventing a lawful arrest. The jury found 13 non-statutory aggravating factors. These included three "other serious acts of violence": (1) assault and battery and threatening to commit a crime (1996); (2) assault with intent to kill, assault and battery, and possession of a firearm without a permit (1996); and (3) armed robbery and two counts of assault and battery with a dangerous weapon (knife and shod foot) (1997), and nine "other serious criminal behavior": (1) false imprisonment (2003); (2) probation violation (2003); (3) armed robbery (El Mexicano Restaurant) (2006); (4) felon in possession (El Mexicano Restaurant) (2006); (5) armed robbery and conspiracy to commit robbery (7-Eleven Store) (2006); (6) felon in

6

The defendant asserts that the State's case selection methodology is flawed because, among other reasons, "no death-sentenced defendant in the State's pool was clearly found to have committed a merely knowing murder of an officer," no jury imposed a death sentence "after specifically rejecting a finding of a purpose to kill," and the statutes in the jurisdictions chosen by the State are not "so uniquely similar as to justify only their inclusion in comparative proportionality review." He argues, among other things, that because the State alleged, but the jury did not find, "purpose to kill" as a statutory aggravating factor, and because in cases in which defendants did not purposely kill a police officer they were all sentenced to life imprisonment, his sentence is comparatively disproportionate.

We are not persuaded by the defendant's attempt to negate the significance of the death penalty cases relied upon by the State. Under New Hampshire law, a defendant is not eligible for a death sentence unless a unanimous jury finds beyond a reasonable doubt <u>both</u> that the defendant is guilty of capital murder for knowingly causing the death of another under one of seven specific circumstances, <u>and</u> that the State has proved two statutory aggravating factors, one of which is that the defendant acted purposely when committing the capital murder. <u>See</u> RSA 630:1 (Supp. 2014),:5, I-II, IV, VII (2007). The statute provides three variants of the aggravating factor requiring purposeful conduct:

---

possession (7-Eleven Store) (2006); (7) accomplice to reckless conduct with a firearm and conspiracy to commit criminal threatening (345 Edward J. Roy Drive) (2006); (8) felon in possession (capital murder) (2006); and (9) reckless conduct (disposing of firearm) (2006). In addition, the jury found the victim impact evidence non-statutory aggravating factor. The jury found 16 mitigating factors: (1) if not sentenced to death, the defendant would automatically be sentenced to life imprisonment without parole; (2) the murder did not involve substantial planning or premeditation; (3) the defendant surrendered without resistance and without causing additional harm; (4) the defendant's mother had a history of psychiatric problems, neglected her prenatal care, and engaged in violence and drug and alcohol abuse during her pregnancy with him; (5) during the defendant's childhood, his mother engaged in acts of violence, substance abuse, and mentally unstable behavior in his presence; (6) the defendant's mother was physically abusive to him during his childhood; (7) the defendant's father was a drug abuser and engaged in criminal conduct; (8) the defendant was left alone with his mother in his early childhood despite contrary instructions from the Department of Social Services; (9) during the defendant's childhood, family members engaged in substance abuse in the home; (10) during the defendant's childhood, he witnessed family members engaged in criminal behavior including acts of violence; (11) the defendant was in special education programs; (12) the defendant was able to perform better and maintain his behavior when placed in classrooms with one-on-one instruction; (13) when he was a young child, the defendant did not receive the psychological counseling recommended by mental health professionals; (14) the defendant did not receive the nurturing necessary for healthy development during his childhood; (15) the defendant was left in the care of many different persons during his childhood; and (16) the defendant was exposed to crime, violence, drug dealing and drug abuse during his adolescence.

7

(a) The defendant:

    (1) purposely killed the victim;

    (2) purposely inflicted serious bodily injury which resulted in the death of the victim;

    (3) purposely engaged in conduct which:

        (A) the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense; and

        (B) resulted in the death of the victim.

RSA 630:5, VII(a). In this case, the jury rejected as "not proven," that the defendant purposely killed Officer Briggs. Addison, 165 N.H. at 658 (quotation omitted). However, the jury unanimously found both that the defendant purposely inflicted serious bodily injury that resulted in the death of Officer Briggs, and that the defendant purposely engaged in conduct that he knew would create a grave risk of death to another and that resulted in the death of Officer Briggs. See id. We, therefore, conclude that the defendant's argument does not draw a meaningful distinction for purposes of our comparative proportionality review.

The defendant also asserts that the State's case analysis is flawed and that "[i]t has identified no patterns or defining characteristics across a series of jury verdicts that purport to distinguish defendants sentenced to death from those sentenced to life." The defendant identifies a comparison universe of approximately 350 cases from more than 25 out-of-state jurisdictions in which defendants killed law enforcement officers acting in the line of duty. The State argues that "the sheer number of cases included in the defendant's pool makes meaningful review inefficient and therefore, not meaningful," and that "[t]he defendant makes no attempt to narrow his pool to those cases[ ] which are most similar to his own in accordance with the criteria set forth" in Proportionality Framework. The State also asserts that because it proved purposeful conduct as to the statutory aggravating factors set forth in RSA 630:5, VII(a), it "need not prove that the defendant purposely killed the victim" and, therefore, the cases cited by the defendant in which purpose to kill is a statutory requirement for death eligibility are not "similar" and fail to take into account "the differences between the statutory scheme in New Hampshire and the schemes in other comparison states."

We have reviewed all the cases cited by the parties, and we conclude that the cases relied upon by the State generally represent those that most closely fit the parameters laid out in Proportionality Framework. Those cases provide

sufficient information about the nature and circumstances of the capital murder to allow us to determine whether juries generally impose a death sentence in capital murder cases similar to the defendant's case, "considering both the crime and the defendant," RSA 630:5, XI(c). See State v. Cruz, 181 P.3d 196 (Ariz. 2008) (en banc) (death); State v. Rose, 297 P.3d 906 (Ariz.) (death), cert. denied (2013); Dickens v. State, 754 N.E.2d 1 (Ind. 2001) (life); Jeter v. State, 888 N.E.2d 1257 (Ind. 2008) (life); Pruitt v. State, 834 N.E.2d 90 (Ind. 2005) (death); Ritchie v. State, 809 N.E.2d 258 (Ind. 2004) (death); State v. Simon, 737 A.2d 1 (N.J. 1999) (death); Williams v. Thaler, 602 F.3d 291 (5th Cir. 2010) (death); Garza v. Thaler, 909 F. Supp. 2d 578 (W.D. Tex. 2012) (death); Will v. Thaler, No. H-07-CV-1000, 2010 WL 2179680 (S.D. Tex. May 25, 2010) (death). A brief description of these cases is set forth in the Appendix to this opinion.

Because "[u]ltimately, no two capital murder defendants are alike," none of the comparison cases are identical to the case before us. Proportionality Framework, 160 N.H. at 774. However, our function is to identify an aberrant death sentence, not to search for proof that a defendant's sentence is perfectly symmetrical with the penalty imposed in all other similar cases. Id. Our review of the cases does not support a finding that the death penalty is only rarely imposed for the murder of a law enforcement officer acting in the line of duty. Rather, the cases reveal "a pattern of jury verdicts" imposing death in similar cases. Id. at 761. We hold that the death sentence imposed upon the defendant in this case is not "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." RSA 630:5, XI(c). Accordingly, the defendant's sentence of death is affirmed. RSA 630:5, XII(a).

Affirmed.

DALIANIS, C.J., and HICKS, CONBOY, LYNN, and BASSETT, JJ., concurred.

9

| Source(s) | Basic Facts | Brief Description |
|---|---|---|
| State v. Cruz, 181 P.3d 196 (Ariz. 2008) (en banc) | Defendant sentenced to death for killing a police officer by shooting him at close range during a chase on foot. | Aggravating evidence included that victim was an on-duty police officer killed in the course of performing his official duties and that defendant knew or should have known that the victim was a police officer. Mitigating factors included: impaired capacity to appreciate the wrongfulness of his conduct; impaired capacity to conform his conduct to the law; unusual and substantial duress; unforeseeability that the acts would cause death; dysfunctional family; deprivation of necessary nurturing and love from family; family history of mental disorders; post-traumatic stress disorder; drug addiction; mental state affected by family history of mental disorders and drug addiction; unfavorable impact on defendant's family; existence of family support; compliance with prison rules; lack of propensity for future violence; capability to adapt to prison life; lack of plan to commit the murder. |
| State v. Rose, 297 P.3d 906 (Ariz.), cert. denied (2013) | Defendant sentenced to death for shooting a police officer at close range during defendant's arrest. | Jury found four aggravating circumstances: (1) defendant previously convicted of a serious offense; (2) defendant committed the offense in expectation of the receipt of anything of a pecuniary value; (3) defendant committed the offense while on probation for a felony offense; (4) victim was an on-duty police officer killed in the course of performing his official duties and defendant knew or should have known the victim was a police officer. Defendant presented mitigating evidence including mental health problems, multiple head injuries, drug and alcohol addiction, low IQ, use of methamphetamine in the days before the murder, and emotional neglect from his father. |
| Dickens v. State, 754 N.E.2d 1 (Ind. 2001); Dickens v. State, 997 N.E.2d 56 (Ind. 2013) | 16-year-old defendant sentenced to life imprisonment without parole for shooting a police officer at close range when the on-duty officer was pursuing him on foot. | In a post-conviction proceeding, the court noted that defendant had prior history of attempted flight from police and history of violence both in and out of custody, and that he had previously "pistol whipped" a person, pointed a gun at another person's face, and engaged in fights while in custody. |

| | | |
|---|---|---|
| Jeter v. State, 888 N.E.2d 1257 (Ind. 2008); State's Appendix, Exhibit 3 | Defendant sentenced to life imprisonment without parole for shooting a police officer at close range as defendant tried to flee. | Aggravating evidence included that the victim was a law enforcement officer acting in the course of duty. Defendant presented evidence that he was depressed, narcissistic, paranoid, and addicted to marijuana. |
| Pruitt v. State, 834 N.E.2d 90 (Ind. 2005); Pruitt v. State, 903 N.E.2d 899 (Ind. 2009) | Defendant sentenced to death for shooting a police officer at close range during a traffic stop. | Aggravating evidence included that victim was a law enforcement officer killed in the course of his duties. The defendant presented evidence including claims of mental retardation, mental illness, a dysfunctional childhood including physical and verbal abuse by his father, head trauma, and ingestion of kerosene and gasoline at a young age. |
| Ritchie v. State, 809 N.E.2d 258 (Ind. 2004); Ritchie v. State, 875 N.E.2d 706 (Ind. 2007) | Defendant sentenced to death for shooting a police officer during a chase on foot. | Aggravating factors included that the victim was a law enforcement officer acting in the course of duty, the defendant knew that the victim was a police officer, and at the time the murder was committed the defendant was on probation after receiving a sentence for the commission of a felony. Mitigating evidence included the defendant's difficulties in school, a diagnosis of Attention Deficit Disorder, psychiatric hospitalization at the age of 10, emotional and behavioral problems, head injuries he suffered as a teenager, his mother's use of drugs while pregnant with him and during his childhood, her sexual promiscuity, and drug and alcohol use in the household. |
| State v. Simon, 737 A.2d 1 (N.J. 1999) | Defendant sentenced to death for shooting a police officer at close range during a traffic stop. | Aggravating evidence included: (1) defendant murdered a police officer during the performance of his official duties; (2) victim was murdered while defendant was engaged in flight after committing burglary; (3) the murder was committed for the purpose of escaping detection, apprehension, trial, punishment or confinement for another offense committed by defendant; (4) defendant previously was convicted of another murder. Defendant proffered 126 mitigating circumstances related to his life including physical and verbal abuse from his parents, drug abuse and petty offenses, and evidence of mental health issues including that he suffered from an antisocial personality disorder. |

11

| | | |
|---|---|---|
| Williams v. Thaler, 602 F.3d 291 (5th Cir. 2010) | Defendant sentenced to death for shooting a police officer at close range in order to avoid arrest. | State presented evidence that several days before the shooting defendant stole a car at gunpoint, defendant committed several previous robberies, including a robbery-shooting using the same gun as that used in the murder. The defendant presented evidence including that he had family support, he showed a low IQ when tested in high school, he was diagnosed by school officials as emotionally disturbed, he served honorably in the Navy, and was able to hold a job after his discharge. |
| Garza v. Thaler, 909 F. Supp. 2d 578 (W.D. Tex. 2012) | Defendant sentenced to death for shooting a police officer in the head at close range with the officer's service weapon during the defendant's arrest following a chase on foot. | State presented evidence of 25 prior crimes committed by the defendant both as a juvenile and an adult including burglary, motor vehicle theft, possession of three knives and a screwdriver on school property, possession of stolen property including a pistol and ammunition, escape from custody, theft, resisting arrest, criminal mischief, unlawful carrying of a weapon, driving under the influence, and possession of marijuana. Defendant presented evidence of his troubled upbringing including verbal and physical abuse by his father, his father's incarcerations, his father's drug use in defendant's presence, and his father's fatal overdose. |
| Will v. Thaler, No. H-07-CV-1000, 2010 WL 2179680 (S.D. Tex. May 25, 2010); Will v. State, No. 74,306, 2004 WL 3093238 (Tex. Crim. App. April 21, 2004) | Defendant sentenced to death for shooting a police officer during a chase on foot. | State presented evidence of defendant's criminal history of a misdemeanor conviction for evading arrest, a felony conviction for unauthorized use of a vehicle, an aggravated robbery conviction committed while defendant was on community supervision, and three disciplinary rule violations while incarcerated awaiting trial for murder. Defendant presented evidence that he would not likely commit violence in a structured prison environment and evidence that he had an unstable family background. |